242 N.J. Super. 36 (1990)
576 A.2d 4
PATRICIA RUBANICK, EXECUTRIX OF THE ESTATE OF RONALD G. RUBANICK, AND PATRICIA RUBANICK, INDIVIDUALLY AND AS GUARDIAN AD LITEM FOR DAMIEN RUBANICK AND RONALD C. RUBANICK, INFANTS, PLAINTIFFS-APPELLANTS,
v.
WITCO CHEMICAL CORP., DEFENDANT, AND MONSANTO CO., DEFENDANT-RESPONDENT.
OMBRA DEMAIO, EXECUTRIX OF THE ESTATE OF ANTHONY DEMAIO AND OMBRA DEMAIO, INDIVIDUALLY, PLAINTIFFS-APPELLANTS,
v.
WITCO CHEMICAL CORP., DEFENDANT, AND MONSANTO CO., DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued November 13, 1989.
Decided June 1, 1990.
*39 Before Judges PETRELLA, HAVEY and STERN.
Alfred A. Russo, argued the cause for appellants (Russo & Casey, attorneys; Alfred A. Russo of counsel; Timothy M. Casey on the brief).
William S. Tucker, Jr., argued the cause for respondent (Stryker, Tams & Dill, attorneys; Edith K. Payne of counsel and on the brief).
The opinion of the court was delivered by PETRELLA, P.J.A.D.
In these toxic tort cases, consolidated for purposes of this appeal, plaintiffs appeal from orders for summary judgment which dismissed their respective wrongful death actions against defendant Monsanto Company. Plaintiffs' respective decedents, Ronald G. Rubanick and Anthony DeMaio, had been employed at the Witco Chemical[1] plant in Perth Amboy during a period when the Witco plant had polychlorinated biphenyl *40 (PCB) contamination. The PCBs had been sold to Witco by Monsanto starting in 1969. Plaintiffs alleged in their complaints that their decedents' exposure to the PCBs caused decedents' colon cancers and ultimate untimely deaths.
Immediately before the start of the Rubanick trial, peremptorily scheduled for September 8, 1987, Monsanto moved for an Evidence Rule 8 hearing to challenge the qualifications and competence of plaintiffs' expert in that case, Dr. Earl Balis, a Ph.D. biochemist with primary research responsibilities. Dr. Balis was also listed as the plaintiffs' proposed expert in the DeMaio matter. After a three day in limine hearing conducted on September 9, 10 and 14, 1987, Judge Hamlin, in an opinion reported as Rubanick v. Witco Chemical Corp., 225 N.J. Super. 485, 542 A.2d 975 (Law Div. 1988), concluded that while Dr. Balis may offer an opinion as to human carcinogenesis generally, he was not qualified to testify as to specific causation in individual humans because he lacked the requisite education, training and experience in treating cancer patients. Id. at 493-495, 542 A.2d 975.
Judge Hamlin also excluded the testimony because Dr. Balis had offered a "novel scientific opinion" as to causation which had not been accepted by at least a "substantial minority of the applicable scientific community." Id. at 495-503, 542 A.2d 975. Upon exclusion of Dr. Balis' testimony, Monsanto subsequently moved for summary judgment to dismiss both the Rubanick and DeMaio complaints, reasoning that in neither action could the plaintiffs establish a prima facie case without Dr. Balis' testimony. Judge Hamlin agreed and dismissed both complaints. Plaintiffs then appealed.
We agree with that part of the trial judge's opinion which concludes that the expert witness proffered by the plaintiffs in these consolidated cases may express his opinion as to human carcinogenesis. We reverse the judge's conclusion that Dr. Balis may not testify as to specific causation in individual humans and remand for trial.
*41 Although we do not necessarily agree with the motion judge's opinion about the need for a "substantial minority"[2] view for the opinion expressed by the expert, we conclude that in the field of causation of cancers novel opinions may be expressed by nonmedical expert testimony, if based on adequate education, training, or experience of the witness, unless the opinion proffered would be either illogical, outlandish or totally speculative such that no reasonable jury could accept the opinion. Dr. Balis' proffered opinion in this case would thus be admissible. We hasten to add that Dr. Balis had testified that the general concept that PCBs are carcinogenic and that they could either cause cancer directly or by promoting cancer was neither created by him nor a unique theory.
The facts developed at the hearing were that Monsanto had sold Witco PCB fluids, under the trade name Therminal, beginning in 1969, but discontinued shipments some time prior to 1976. Rubanick, supra, 225 N.J. Super. at 497, 542 A.2d 975. Therminal is a product name for the PCB compound Arochlor, and during the applicable period Monsanto shipped Arochlor 1242 and 1248, which was said to contain 42% and 48% chlorination respectively. Ibid.
Ronald Rubanick worked at Witco from 1974 through 1979, when he was diagnosed as suffering from colon cancer. He was a non-smoker with no family history of cancer. Rubanick died of the cancer on July 23, 1980, at the age of 29. About two and one-half years after Rubanick's death, Anthony DeMaio, a thirty year Witco employee, was also diagnosed as suffering from colon cancer. He died of the cancer on June 29, 1984, at the age of 52.
For purposes of the in limine hearing, Judge Hamlin accepted the fact that Rubanick, while working for Witco, had walked *42 through an area in the work place which had a high degree of PCB contamination "primarily in the earth." Ibid. In his testimony Balis summarized the information given to him about the quantity of PCBs to which Rubanick had been exposed in the following terms:
... there was some thirty-five thousand parts per million PCBs in the soil around there, that he would come home covered with this stuff and the material was oozing out of his clothes, according to I guess it was his wife's testimony, it was something, and I think that report that he lifted these heavy drums and slopping around in this muddy PCB mix, and you also showed some document about the State of New Jersey, some agency complaining about contamination from that stuff.
At the in limine hearing Monsanto presented its three experts first. It produced Dr. Thomas Fahey,[3] a board certified internist, with experience in the diagnosis and treatment of colon cancer; Dr. Raymond Harbison, a Ph.D. toxicologist who had knowledge and experience with human exposures to PCBs; and Dr. Philip Cole, an epidemiologist, with a M.D. and a Ph.D. who indicated he was conversant with the medical and epidemiological literature as to cancer causation and PCB exposure. Id. at 490-491, 542 A.2d 975. Each of these experts testified that they were aware of no "statistically significant" study which had concluded that PCBs cause cancer, and particularly colon cancer, in human beings. Dr. Harbison declined to recognize the International Agency for Research of Cancer (I.A.R.C.) as a valid scientific authority. Id. at 491, 542 A.2d 975. Dr. Cole does not recognize I.A.R.C.[4] as completely authoritative in *43 human cancer causation. Ibid. Their qualifications were challenged not by cross-examination, but by the testimony of Dr. Balis, which was largely elicited as rebuttal testimony.
Dr. Balis has a Ph.D. and worked as a biochemist for the Sloan-Kettering Institute for Cancer Research for over 37 years, specializing in cancer research. He was head of a research group which was primarily concerned with investigating the cause, treatment and diagnosis of colon cancer, and has published extensively on the topic of carcinogenesis. Some of his extensive qualifications are referred to in the published opinion of the trial judge. Id. at 492, 542 A.2d 975.
Balis' opinion that PCB contamination at Witco caused Rubanick's cancer was essentially based on four factors: (1) the extreme rarity of colon cancer in males under the age of 30, particularly when the male is a non-smoker and not from a "cancer family";[5] (2) the fact that 5 out of 105 employees at Witco suffered some type of cancer during the pertinent period; (3) "a very large body of evidence" showing that PCBs produced cancer in experimental animals, and (4) the fact that there is not only a variance of the types of cancers in a PCB exposed population, but as he described them  "unusual cancers." The witness cited various publications, including 13 studies of the effect of PCBs on animals and humans in support of his opinion, with particular emphasis on an epidemiological study by Bertazzi, Riboldi, Pesatori, Radice & Zocchetti, "Cancer Mortality of Capacitor Manufacturing Workers," 11 Amer.J.Indus.Med. 165 (1987).
Balis testified, referring to the Bertazzi study and what happened at the Witco site:

*44 ... one can extrapolate based upon the federal government rules that if a compound is found to cause cancer in experimental animals it's presumed to be carcinogenic to man and it is banned, and secondly, the statistical data indicating in two cases groups of people who were exposed to P.C.B. came down with amounts of cancer where, which were so huge statistically that they cannot be attributed to chance.
In rejecting Dr. Balis' theory of causation, Judge Hamlin considered it "novel" and relied on Windmere, Inc. v. International Ins. Co., 105 N.J. 373, 522 A.2d 405 (1987). He considered "general acceptance" to be acceptance by a substantial minority of the applicable scientific community. Rubanick, supra, 225 N.J. Super. at 500, 542 A.2d 975. Although Judge Hamlin did not spell out what the "applicable" scientific community was he reasoned:
Logic and policy dictate such a construction. If admissibility (as opposed to jury fact finding) were limited only to majority scientific opinions then admissibility would be a simple issue of arithmetic. By opening jury consideration to expert opinions embraced by a substantial minority scientific acceptance, there will be a testing in the advocacy arena of new ideas without prejudicing a party opposing the disfavored or novel principle. [Ibid.]
The question here is not the acceptance of the "general acceptance" standard but whether there are sufficient factual and scientific underpinnings to the expert's causation theory, recognizing that in experimentation and study of known or suspected cancer causing agents as a rule they are not intentionally administered to humans because of the risks involved. In other words, experiments in the field are not, as far as we know, performed directly on humans in order to see if cancer will result.
Windmere, Inc. v. International Ins. Co., supra, 105 N.J. 373, 522 A.2d 405, does not preclude the type of proffered testimony involved here. The Supreme Court in Windmere observed that in the trial there the testimony of the experts concerned the reliability of a scientific device for voice print analysis and that the proffered experts had very limited experience on the subject. Moreover, although the court recognized that no general acceptance within the professional community of voice print analysis had been established, the admission of *45 the voice prints into evidence had not constituted prejudicial error. The Court affirmed the verdict in favor of the defendant insurer. The use of voice prints was acknowledged to be highly debated and that this type of evidence was not yet found to be of sufficient stature to validate the equipment used and the results obtained as had been the case with the breathalyzer, Romano v. Kimmelman, 96 N.J. 66, 78, 474 A.2d 1 (1984); and radar equipment, State v. Dantonio, 18 N.J. 570, 115 A.2d 35 (1955).
When Windmere discussed the "required reliability in terms of its general acceptance within the professional community" it was talking about the required reliability of a device or machine, i.e., the voice print machine. 105 N.J. at 379, 522 A.2d 405. Windmere does not necessarily preclude novel opinions or testimony by the first proponent of any particular theory. It recites various ways in which reliability may be established.
There must also be a factual and scientific basis for an expert's opinion. Buckelew v. Grossbard, 87 N.J. 512, 524, 435 A.2d 1150 (1981). The Supreme Court in Windmere was not concerned "with the qualifications of the experts but with the limited breadth of their experience and their potential bias." In any event, there is a difference between considering the reliability of a device and medical opinion as to the cause of cancer when the human body is exposed to known or suspected toxic or carcinogenic substances. It has been widely considered that PCBs are a carcinogenic substance. See Winter, "Cancer-Causing Agents  A Preventive Guide," 156 (1979) (discussion of PCBs "Polyclorinated Biphenyls"). Bertazzi, supra "Cancer Mortality of Capacitor Mfg. Workers," 11 Am.J.Indus.Med. 165-176 (1987) (possibility of PCBs posing a carcinogenic risk to humans); Gustavson, Hogstedt & Rappe, "Short-Term Mortality and Cancer Incidence in Capacitor Mfg. Workers Exposed to Polychlorinated Biphenyls (PCBs)," 10 Am.J.Indus.Med. 341-344 (1986) (cannot rule out possibility of a carcinogenic risk from PCB exposure).
*46 It appears that it is an improper focus to say that a known carcinogen[6] attacks only a particular target or targets in the body. For instance, although cigarette smoking has been widely discussed as a cause for lung cancer, the lung and pulmonary tract are not the only areas in the body that may be subjected to harm by cigarette smoking. See Sweeting, "A Values Approach to Health Behavior," 124 (1990); Winter, "Cancer-Causing Agents," 187-188 (1979). Nor should the fact that other cases have involved instances where other types of cancer, for instance cancer of the liver, biliary tract and gall bladder, as potentially causally associated with exposure to PCBs, mean that testimony of the cancer causing propensity of exposures to PCBs should be limited to cases involving only such organ specific cancers.[7]
Part of the problem arises in this case because of the fact that an in limine hearing was held at which testimony was taken. We have previously expressed our reservations about the increased frequency of in limine hearings on evidence matters. See Bellardini v. Krikorian, 222 N.J. Super. 457, 464, 537 A.2d 700 (App.Div. 1988). There is no doubt that if objections to the expert's qualifications occurred at trial a Rule 8 hearing could have been held. See Windmere, Inc. v. International Ins. Co., supra, 105 N.J. at 381, 522 A.2d 405. However, the difficulty presented here is that this in limine hearing was extensive and was more than an Evidence Rule 8 hearing on an expert's qualifications. It forced the trial judge *47 to become not only the determiner of the expert qualifications of the witness and the existence of a scientific basis for his opinion (which appears to us sufficiently established to result in a jury question), but to become a fact-finder. The judge had to choose between conflicting testimony of experts and substituted himself for the jury's function on the ultimate issue. This is clear from the three days of testimony in an adversary-type proceeding in which Monsanto actually presented the testimony of its three witnesses first and sought to carry the burden of defending against plaintiffs' expert's testimony before he even got in the witness stand. The judge had stated:
The burden of proof to proceed and to demonstrate by the preponderance of the evidence that Dr. Balis' testimony or proffered testimony would not be proper is upon Monsanto. Therefore, they have the duty of going forward, and the duty of persuading me by the evidence that indeed his testimony should not be admitted as expert testimony for the jury.
Monsanto's attorney disagreed that they had the burden of proof at this hearing, and the judge rephrased his statement so that Monsanto had "the duty of going forward to convince me [that plaintiff's expert's testimony] has not reached that level" of admissibility.
The potential confusion between an Evidence Rule 8 hearing and a trial is emphasized when the trial judge pointed out in his opinion that Balis "has previously served on a research team with Dr. Nancy Kemeny, Rubanick's treating physician at Sloan-Kettering. Dr. Kemeny was not offered as a witness in this case." 225 N.J. Super. at 492, 542 A.2d 975.
Indeed, the trial judge here recognized that he was deviating from the usual and preferred practice, in part because both sides urged him to do so. He said:
It is generally my custom where challenges of such nature are made, to consider them only when the expert is offered in the context of a trial after a jury has been selected generally because this is [a] fuller and more complete factual record upon which to judge the expert's opinion, rather than a vacuum.
*48 Dr. Balis qualifies by definition as an expert.[8] He is a person who by knowledge, training or experience is deemed qualified to testify and express his opinion on cancer development and related scientific matters even if that opinion includes medical subjects. See Sanzari v. Rosenfeld, 34 N.J. 128, 135, 167 A.2d 625 (1961). See also Hake v. Manchester Tp., 98 N.J. 302, 306, 486 A.2d 836 (1985); Rosenberg by Rosenberg v. Cahill, 99 N.J. 318, 327-334, 492 A.2d 371 (1985); Ayers v. Jackson Tp., 202 N.J. Super. 106, 124, 493 A.2d 1314 (App.Div. 1985), mod. on other grounds 106 N.J. 557, 525 A.2d 287 (1987). Deficiencies in the qualification of an expert is a matter to be weighed by the jury. Sanzari v. Rosenfeld, supra, 34 N.J. at 138, 167 A.2d 625; Carbone v. Warburton, 11 N.J. 418, 426, 94 A.2d 680 (1953).[9]
It is for the jury to determine the credibility, weight and probative value of the expert's testimony, Savoia v. F.W. Woolworth Co., 88 N.J. Super. 153, 162, 211 A.2d 214 (App.Div. 1965); Angel v. Rand Express Lines, Inc., 66 N.J. Super. 77, 85-86, 168 A.2d 423 (App.Div. 1961), and the opinion of an expert can rise no higher than the facts and reasoning upon which it is based. Johnson v. Salem Corp., 97 N.J. 78, 91, 477 A.2d 1246 (1984). The jury should, as is usually done, be instructed that it is not bound by any expert's opinion, but it is to consider it and give it the weight to which it deems it is entitled, whether that be great or slight, by weighing the *49 reasons, if any, given for it. The jury is also usually informed that it may reject an expert's opinion, if in its judgment the reasons given for it are unsound, the facts do not exist, or it is not based on knowledge and experience. Polyard v. Terry, 160 N.J. Super. 497, 511, 390 A.2d 653 (App.Div. 1978), aff'd o.b. 79 N.J. 547, 401 A.2d 532 (1979); Mohr v. B.F. Goodrich Rubber Co., 147 N.J. Super. 279, 284, 371 A.2d 288 (App.Div. 1977), certif. den. 74 N.J. 281, 377 A.2d 685 (1977). It is elementary that it is always within the personal function of the jury to decide whether the facts on which the answer of an expert is based actually exist, and the value or weight of an expert's opinion is dependent upon and no stronger than the facts on which it is predicated. Johnson v. Salem Corp., supra, 97 N.J. at 91, 477 A.2d 1246; Polyard v. Terry, supra, 160 N.J. Super. at 511, 390 A.2d 653.
A "net opinion," which is an expert's opinion unsupported by factual evidence, is inadmissible. Matter of Yaccarino, 117 N.J. 175, 196, 564 A.2d 1184 (1989); Buckelew v. Grossbard, supra, 87 N.J. at 524, 435 A.2d 1150; Jakubowski v. Minnesota Mining & Mfg., 42 N.J. 177, 187, 199 A.2d 826 (1964); Johnson v. Salem Corp., supra; cf. Pearson v. St. Paul, 220 N.J. Super. 110, 116, 531 A.2d 744 (App.Div. 1987). This need for supporting data and a factual basis for the expert's opinion is especially important when the opinion is seeking to establish a cause and effect relationship. Tabatchnick v. G.D. Searle & Co., 67 F.R.D. 49, 55 (D.N.J. 1975). However, the rule frequently focuses, as in Parker v. Goldstein, 78 N.J. Super. 472, 483-484, 189 A.2d 441 (App.Div. 1963), certif. den. 40 N.J. 225, 191 A.2d 63 (1963), on the failure of the expert to explain a causal connection between the act or incident complained of and the injury or damage allegedly resulting therefrom. See Rempfer v. Deerfield Packing Corp., 4 N.J. 135, 144-145, 72 A.2d 204 (1950); Castroll v. Franklin Tp., 161 N.J. Super. 190, 193, 391 A.2d 544 (App.Div. 1978). See also Sabloff v. Yamaha Motor Co., Inc., Ltd., 113 N.J. Super. 279, *50 280, 273 A.2d 606 (App.Div. 1971), aff'd 59 N.J. 365, 283 A.2d 321 (1971).
Indeed, even if the testimony of an expert is uncontradicted, it is still for the jury to exercise its independent judgment in considering the matter. Chattin v. Cape May Greene, Inc., 216 N.J. Super. 618, 640, 524 A.2d 841 (App.Div. 1987), certif. den. 107 N.J. 148, 526 A.2d 209 (1987); Middlesex County v. Clearwater Village, Inc., 163 N.J. Super. 166, 174, 394 A.2d 390 (App.Div. 1978), certif. den. 79 N.J. 483, 401 A.2d 239 (1979). See also Evid.R. 56; Evid.R. 57 and Holm v. U.S., 325 F.2d 44, 46 (9 Cir.1963).
Evid.R. 56(2) provides that the expert testimony may be based on an opinion or inference from facts or data which he either perceived or were made known to him at or before the hearing. Those facts need not be admissible in evidence if they are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." State v. McBride, 213 N.J. Super. 255, 269, 517 A.2d 152 (App. Div. 1986). The source of this language is Fed.Evid.R. 703. The purpose of the rule as presently formulated is to "allow more latitude in the admission of expert opinion testimony" without rendering inconsistent the "spirit" of the old rule regarding whether the underlying facts need to be admissible. Evid.R. 56 (Anno. 1990).
Since Evid.R. 56(2) is similar to the federal evidence rules, the various treatises which analyze the federal rules are instructive.
... [T]here is a question whether opinion evidence is admissible if the court believes that the state of the pertinent art or scientific knowledge does not permit a reasonable opinion to be asserted even by an expert. [Footnote omitted] Also, expert opinion need not be admitted if the court believes that an opinion based upon particular facts cannot be grounded upon those facts.[14] *51 [Citations omitted]. [McCormick on Evidence, § 13, (3d ed. 1984)]. [Footnote as in quoted text].
It has been observed that to establish the value of real estate the courts should evaluate the validity of the expert's opinion and the facts on which it is based in order to determine what weight, if any, should be given to that opinion. Bowen v. Bowen, 96 N.J. 36, 50, 473 A.2d 73 (1984), citing Glenn Wall Assoc. v. Wall Tp., 6 N.J. Tax 24, 31-33 (1983). Where the basis for the opinion is questionable, it is proper for the trial judge to "determine their factual underpinnings outside of the jury's presence" rather than impose the sanction of excluding the testimony. Gaido v. Weiser, 227 N.J. Super. 175, 193, 545 A.2d 1350 (App.Div. 1988), aff'd on other grounds 115 N.J. 310, 558 A.2d 845 (1989). If the court determines that the expert's testimony is unreliable, that opinion may be excluded. Bowen v. Bowen, supra, 96 N.J. at 50, 473 A.2d 73.
Regardless of the standard for admissibility, arguments to the jury concerning the weight to be given an expert opinion or evidence may have significant impact. McCormick on Evidence, § 203 (3d ed. 1984). This treatise also notes that in environmental or drug litigation a party may seek to prove that the implicated chemical is carcinogenic through the use of statistical studies. Id. at § 209.
The weight that may be given such testimony will depend, of course, on the skill of counsel and the ability and preparation of the witness. In addition, the methods that the expert uses to analyze and interpret that data, so as to assist the court or jury in understanding it, may be of great importance in determining the outcome. Ibid.

Studies establishing a statistically sound causal relationship between a chemical and human cancer may be supportive of a causation theory, notwithstanding the fact that a majority of the relevant disciplines may not have yet expressed agreement with a particular study. A broad approach is desirable when investigating questions of causation, and as the dissent notes: "factors pertaining to the injured party in question, such as his medical history, significant diagnostic and pathological findings, [as well as] the duration, quantum and *52 manner of exposure to the offending chemical, may well add to the reliability of the expert's opinion."[10] Although the record lacks any reference to the employees' employment history and other necessary factors, the lack of a complete record is in part a problem with the type of in limine ruling made here. See Bellardini v. Krikorian, supra, 222 N.J. Super. at 464, 537 A.2d 700. We note that in the transcripts of the three day in limine hearings Balis testified that he relied in part on affidavits (marked for identification) of Kenneth D. Rosenman, the Director of Occupational and Environmental Health Services in the New Jersey Department of Health and of Robert H. Tucker who is employed as a research scientist by the New Jersey Department of Environmental Protection, Office of Cancer and Toxic Substances Research. Neither of these individuals testified at this hearing, although plaintiff may have intended to have them testify as witnesses at the trial.[11] Rosenman stated in his affidavit that:
5. Studies have shown that PCBs have the potential for causing acute health problems; such as skin disease (e.g. chloracne), liver disease (e.g. toxic hepatitis), and restrictive lung disease. Congenital birth defects have also been traced to PCB exposure as well as cancer in animals. (Emphasis added).
6. PCBs are a stable compound that are poorly metabolized by the body and, therefore, are stored in the body after exposure. PCB levels in human[s] increase over time of exposure. Studies of U.S. workers exposed to PCBs have revealed liver, lung, and skin problems. The International Agency for Research on Cancer lists PCBs as a probable carcinogen.
7. The routes of exposure for PCBs are inhalation, skin absorption, and ingestion.
Tucker stated in his affidavit:
5. PCBs have caused profound toxic effects in humans. A most notable poisoning incident was the Yosho outbreak in Japan in 1968. The skin and liver are major sites of pathology with the gastrointestinal tract and nervous *53 systems also being targets. Animal studies have shown that PCBs are carcinogenic and that they can also enhance the carcinogenicity of other chemicals. Scientists are now in general agreement that there is no lower safe limit for chemicals that cause cancer, that is, although the risk decreases as the chemical concentration goes down there is no `threshold' value below which no risk occurs. The Federal Environmental Protection Agency calculates that an exposure level as low as 0.26 nanograms of PCBs per liter of water could lead to an increased risk exposure of 1 cancer per 100,000 people.
* * * * * * * *
7. PCBs can enter the atmosphere by vaporization and may be found in either gaseous form or absorbed to airborne particulates. Persons in the area of PCB contamination, such as found on the Witco site, are subject to substantial PCB exposure through inhalation of vapors or particulates containing the contaminant.
8. Skin contact with PCBs presents a health risk since these compounds may be absorbed through the skin.
9. With airborne, skin absorption, and foodchain routes of exposure to the human population possible from the PCBs contaminating the Witco site, this situation represents a serious threat to human health. The concentrations of PCBs involved clearly present an unreasonable risk.
All of those factors should be explored at a trial to the extent that they are relevant.
The fact that an expert's opinion may not generally be accepted in the scientific community, is not a reason to preclude a qualified expert from testifying as to his opinion on causation, where there is a well-reasoned basis for the opinion based upon the expert's training, education and experience. See Ferebee v. Chevron Chemical Co., 736 F.2d 1529, 1535-1536 (D.C. Cir.1984), cert. den. 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984) (pulmonary specialist permitted to testify that paraquat caused plaintiff's pulmonary fibrosis, notwithstanding the fact that expert's opinions were not generally accepted in scientific community).
Thus, a cause-effect relationship need not be clearly established by animal or epidemiological studies before a doctor can testify that, in his opinion, such a relationship exists. As long as the basic methodology employed to reach such a conclusion is sound, such as use of tissue samples, standard tests, and patient examination, products liability law does not preclude recovery until a `statistically significant' number of people have been injured or until science has had the time and resources to complete sophisticated laboratory studies of the chemical. In a courtroom, the test for allowing a plaintiff to recover in a tort *54 suit of this type is not scientific certainty but legal sufficiency; if reasonable jurors could conclude from the expert testimony that paraquat more likely than not caused Ferebee's injury, the fact that another jury might reach the opposite conclusion or that science would require more evidence before conclusively considering the causation question resolved is irrelevant. [736 F.2d at 1535].
See also Wells v. Ortho Pharmaceutical Corp., 788 F.2d 741, 745 (11 Cir.1986), cert. den. 479 U.S. 950, 107 S.Ct. 437, 93 L.Ed.2d 386 (1986).
Weinstein's Evidence, § 702[03] (1988), suggests that an appropriate approach to determine whether or not to admit expert opinion testimony based on novel scientific evidence would be by reviewing it under a Fed.R.Evid. 403 analysis. (Fed.R.Evid. 403 is essentially identical to Evid.R. 4). Thus, the court would first assess the probative value of the proffered testimony and then assess the dangers posed by admitting this testimony.
After assessing probative value, the court must also assess the dangers posed by this particular kind of expert scientific evidence. The court will have to evaluate the degree to which the jurors might be over impressed by the aura of reliability surrounding the evidence, thereby leading them to abdicate their role of critical assessment. In making this determination the nature of the evidence may be significant. Some scientific evidence merely guides the jury in making its own assessment of the evidence; in other instances, the jury may be incapable of estimating the accuracy of the expert's conclusions by reference to the data on which the expert relies. Confusion of the jury, and the inordinate consumption of trial time are other dangers for the court to consider. See Rule 403. [Footnotes omitted]. Weinstein's Evidence, § 702[03] (1988).
Under such an approach the court should also consider:
... such factors as the significance of the issue to which the evidence is directed, the availability of other proof, and the utility of limiting instructions. * * * The court may also be influenced by the extent to which the issues posed by this novel evidence were explored prior to trial, and whether the party opposing admissibility is adequately prepared. * * * The availability of competent experts to explore the limitations of the novel technique may also enter into the court's calculus. [Footnotes omitted.] Ibid.

A relevancy analysis favors admissibility whenever the general conditions for admissibility are met. Ibid. It is not clear in this case that no reasonable expert could base an opinion on the studies and research relied on by Dr. Balis. In our view, Dr. Balis need not have treated or have been able to medically *55 treat plaintiffs in order to render a scientific opinion as to the cause or causes of the decedents' colon cancer. It was for the jury to determine the facts and to either accept or reject the methodology used by Dr. Balis and his opinion based on the reasons given therefor. The motion judge in this case usurped the jury's fact-finding function. Moreover, in concluding that Dr. Balis had "glossed over" significant factors the motion judge again intruded on the jury's function. Such matters are properly the subject of exploration and cross-examination at a trial. Obviously, the proceeding here was not intended to be a substitute for a trial. It did, however, prevent a trial and had the effect of precluding plaintiffs from having their proper day in court. In our view Dr. Balis qualified as an appropriate expert and should have been allowed to express his opinion with respect to whether PCB contamination at Witco was a proximate cause of Rubanick's cancer.
The dissent relies in part on cases involving the effect of and adverse reactions by some individuals to certain medications. We find these types of cases inapposite with respect to a discussion of the carcinogenic effect of PCBs. The dissent also notes that Dr. Balis' ultimate opinion is couched in terms of "highly probable" and "probable" but when pressed his testimony was couched in terms of "possibilities" and "high possibilities." Of course, the medical and scientific professions do not necessarily think or speak in terms of legal jargon. Hence, it must be ascertained what is meant by the witness when terms such as "highly probable," "probable," "possibility" and "high possibility" are used in relation to the "reasonable probability" standard. Parenthetically, Dr. Balis conceded he had never testified as an expert witness before (and hoped it would be his last). Thus, he would not necessarily express his opinion in carefully phrased legal jargon. Judge Hamlin asked Balis if in general the majority of the scientific community accepts the thesis that PCBs are carcinogens. The witness responded:
Well, let me put it this way. I don't think the majority of the scientific community pays any attention to PCBs whatsoever.

*56 If you're talking about those who have worked on PCBs and who have published on PCBs, I would say that of the thirty-nine papers that I've looked at, thirteen say yes, three or four are sort of equivocal, and the others I don't remember in detail, but I have, somewheres around here I had thirteen papers that supported it.
In addition, the testimony which discusses possibilities versus probabilities was in response to the court's question:
Within the scientific community, based upon all the information and literature you have seen, is there general or majority agreement by the scientists involved in the discipline that exposure to PCBs would probably cause colon cancer in humans?
Balis' answer was "Probably, that's very difficult." He said that the scientists with whom he had discussed the proposition said "they think it's a damn good candidate but they're not saying probable[;] ... they said it's a high possibility." The issue is whether Balis' opinion is that the PCB exposure probably caused Rubanick's cancer, not the phraseology used by other scientists.
With regard to "Probability and possibility; capacity and tendency; cause and effect" 7 Wigmore, Evidence, (Chadbourne rev. 1978) § 1976 states:
There is no sufficient reason for excluding such statements from qualified witnesses, because it must almost always be impossible for a witness to reproduce in words absolutely all the detailed data which enter into his estimate, and there can be no danger in receiving such an estimate from him....
It should be added that courts sometimes misapply the opinion rule to enforce the doctrine of torts that a recovery for future personal injuries must include only the certain or fairly probable, but not the merely possible, consequences; so that the judge, instead of covering the subject by an instruction to the jury as to the measure of recovery, excludes from evidence a physician's opinion expressed in terms of possibility only. This attempt to control the course of expert testimony is of course unreasonable in itself. Its unsoundness becomes the more notable when the same court is found ruling, in another line of precedence, that the physician may express an opinion as to what might have caused an injury, but not as to what did cause it. In other words, possibility, as affecting consequences, is tabooed, and only actuality is to be accepted; a possibility, as affecting causes, is sanctioned, while actuality is tabooed.
This is only one of the many instances in which the subtle mental twistings produced by the opinion rule have reduced this part of the law to a congeries of nonsense which is comparable to the incantations of medieval sorcerers and sullies the name of reason in our law. [Citations and footnotes omitted.]
*57 We therefore reverse the order which precluded Dr. Balis from giving his scientific expert testimony and remand for trial in accordance herewith.
STERN, J.A.D., concurring.
Logic would suggest that a biochemist who devoted a "[l]ittle over thirty-seven years" of his life doing research at the Sloan-Kettering Institute for Cancer Research in New York City, one of the most well-known and respected centers for the study of cancer, oncology and related medical conditions, would be qualified to inform a lay jury about whether plaintiffs' colon cancer was caused by exposure to polychlorinated biphenyl (PCB) contamination. This is particularly true of a person who, for thirty-seven years, "headed up a research group concerned with the investigation of the cause, diagnosis and treatment of colon cancer", the very type of cancer which caused the deaths of plaintiffs' decedents. Rubanick v. Witco Chemical Corp., 225 N.J. Super. 485, 492, 542 A.2d 975 (Law Div. 1988). And as if more were needed, the proffered expert had "previously served as chairman of the Department of Biochemistry of the Cornell University Medical College [which is the Sloan-Kettering division of the Cornell University Graduate School of Medicine], ... was an Associate Editor of [a professional publication regarding cancer research and had] personally authored or participated in the publication of approximately 170 scientific articles of which approximately 15 dealt with carcinogenesis." Ibid. But, while the trial court concluded that the plaintiffs' expert, Dr. Earl Balis, had the "training, experience, research and familiarity ... with the scientific literature on carcinogenesis," and was therefore qualified "to offer any opinion as to human carcinogenesis generally", id. at 493, 542 A.2d 975, the judge ruled that "Dr. Balis does not have the requisite expertise to offer an opinion as to causal relationship between [decedents'] cancer and [their] exposure to PCBs." Id. at 495, 542 A.2d 975.
The problem that plaintiffs face is that their expert may have been too qualified and advanced in his thinking, based upon his *58 extraordinary expertise. There always has to be a first; someone must always be the innovator. Yet, I suppose that Christopher Columbus could never have been qualified as an expert to render an opinion on circumnavigation, and the Wright brothers would never have been able to testify as experts and give opinions relating to flight because, for much of their day, their views never gained "general acceptance within the scientific community." Windmere, Inc. v. International Ins. Co., 105 N.J. 373, 379, 522 A.2d 405 (1987).
My colleagues agree that the trial judge in this case, by interpreting the "general acceptance" standard to mean acceptance by "at least a substantial minority of the applicable scientific community," Rubanick, supra, 225 N.J. Super. at 500, 542 A.2d 975, applied the governing standard too narrowly. As Judge Havey has developed, the "general acceptance" standard, adopted by our Supreme Court in various cases cited and discussed in the dissent, "involves the admissibility of the results of a scientifically novel device, technique or mode of analysis," post, at 64, 576 A.2d at 19 (Havey, J.A.D. dissenting). See also the lead opinion of Judge Petrella, at 45, 576 A.2d at 8. I am therefore in full agreement with my colleagues that we are free to employ a broader standard when the issue concerns an expert opinion relating to the question of "causation," as opposed to the reliability of a specific test or analysis, see also State v. Tate, 102 N.J. 64, 83, 505 A.2d 941 (1986); State v. Sugar, 100 N.J. 214, 242, 495 A.2d 90 (1985), although reliability remains the critical factor which permits admissibility. See, e.g., State v. Cavallo, 88 N.J. 508, 516-518, 443 A.2d 1020 (1982); Windmere Inc. v. International Ins. Co., supra.
While I would like to join Judge Petrella in holding that the expert opinion of Dr. Balis has already been shown to be admissible, it remains the responsibility of the trial judge to determine if the "expert testimony is sufficiently reliable to be of assistance to the jury," Cavallo, supra, 88 N.J. at 519, 443 A.2d 1020, and I am convinced by Judge Havey's thorough *59 analysis of the issue in the context of toxic tort litigation, that the present record developed at the in limine hearing does not support the conclusion that Dr. Balis' opinion (that decedents' deaths were probably caused by their exposure to PCBs) is admissible before a jury.
Unlike Judge Petrella, whose sense of justice and fairness seems appropriate (after all what is so wrong with giving all of the qualifications and issues to the jury to evaluate in terms of credibility),[1] I recognize the technical precision and policy basis for Judge Havey's conclusion that, while Evid.R. 56(2) permits an expert to base his opinion on facts and data known to him, "[t]here must be a factual and scientific basis to meet the reliability threshold." Post, at 66-67, 576 A.2d at 20 (Havey, J.A.D. dissenting). See also Vuocolo v. Diamond Shamrock Chemicals Co., 240 N.J. Super. 289, 573 A.2d 196 (App.Div. 1990). However, I part company with Judge Havey because, in my view, there is other evidence which may be developed at trial to support  and render "reliable"  Dr. Balis' conclusion that the deaths were caused by colon cancer which, in turn, was caused by exposure to PCBs. In other words, further proofs by plaintiffs may well render the expert opinion as to causation reliable and, therefore, admissible.
*60 The motion judge, after granting the application to bar Dr. Balis' testimony, entered summary judgment against Rubanick and DeMaio, the plaintiff in the consolidated appeal, because there was no evidence on which to proceed. Both decedents were employed at the Witco Chemical plant in Perth Amboy and both were allegedly exposed to PCBs while employed there.
I join Judge Petrella and vote to reverse the dismissal and to remand for trial. I believe that the plaintiffs should have an opportunity to further develop the record, if they can, and to present additional evidence including the proofs which Judge Havey indicates to be necessary to sustain the admissibility of Dr. Balis' opinion. Post, at 67-68, 72, 576 A.2d at 20, 23 (Havey, J.A.D. dissenting). Given the "sense of uncertainty" with respect of the law governing the admissibility of Dr. Balis' testimony at the time it was presented, I am "reluctant to rule as a matter of law" that the plaintiffs cannot prevail if they are given an opportunity to gather and present additional evidence. State v. Gardner, 113 N.J. 510, 521, 551 A.2d 981 (1989). See also Sholtis v. American Cyanamid Co., 238 N.J. Super. 8, 17-18, 568 A.2d 1196 (App.Div. 1989).
As Judge Petrella has developed, this matter was decided on the basis of an in limine hearing, and as he has demonstrated, dispositive rulings after such hearings "are often [made] in the abstract and not in the context of facts [which would be] adduced at trial." Bellardini v. Krikorian, 222 N.J. Super. 457, 464, 537 A.2d 700 (App.Div. 1988). Compare State v. Cavallo, supra, 88 N.J. at 519, 443 A.2d 1020. See also Sholtis v. American Cyanamid Co., supra, 238 N.J. Super. at 17-18, 568 A.2d 1196 ("[e]ven as late as at trial, previously undisclosed witnesses may be produced where the failure to supply the witness' `name in answers to interrogatories was not the result of a design to mislead and where there is no surprise or prejudice to the opposing party if the testimony is allowed.'").
Dr. Balis' opinion with respect to Rubanick was based on the *61 combination of three factors; "[h]is age,"[2] "[t]he rather strong evidence that PCBs are carcinogenic and that they cause a wide variety of cancers and aberrant cell production in non-primates, lower primates and humans" and the number of Witco employees, 5 out of 47 or 5 out of 105 in plaintiffs' sample, who had developed cancer.[3] Dr. Balis considered the 1983 affidavits of Dr. Kenneth Roseman of the Department of Health, a former Assistant Professor of Epidemiology at the University of Massachusetts, who certified that soil samples taken from the Witco site "shows extremely high levels of polychlorinated biphenyl (`PCB') contamination in the soil" and posed a health "risk" because "[t]he International Agency for Research on Cancer lists PCB's as a probable carcinogen." Dr. Balis had also reviewed the 1983 affidavit of Dr. Robert R. Tucker, a supervising "research scientist" with the Department of Environmental Protection's Office of Cancer and Toxic Substances Research, who indicated that relevant "analytical data show extremely high amounts of PCB contamination on the site" and that "[p]ersons in the area of PCB contamination, such as found on the Witco site, are subject to substantial PCB exposure...." Further, a "Health Hazard Evaluation Report" prepared by the National Institute for Occupational Safety and Health in 1985 determined "that health hazards exist at Witco Chemical Corporation" and that they "include absorption of PCBs in certain workers from 1964 to 1972." According to the report, "PCBs were used in heat exchangers as the heat transfer medium in polyester resin production from 1964 to 1972. They were removed from the heat exchangers in 1972" but while "Polyester Department and Maintenance Department workers presumably had had their highest exposures to PCBs ... because of soil contamination around the heat exchangers, all workers *62 may have had some exposure" and "soil containing PCBs levels above 50 ppm was [not] removed [until] early 1983."
I am satisfied, upon further development of what is of record, with emphasis related to the number of Witco employees who developed colon cancer (as compared with the general population), their ages as compared with the ages of those employees who did not develop cancer and the general age samplings of cancer victims, the percentage of employees contracting cancer who worked at Witco before 1972, between 1972 and 1983, and only thereafter, enough may well be developed at trial to render Dr. Balis' opinion "reliable" and therefore admissible.[4]
In any event, I would permit plaintiffs to go forward at trial "to attempt to develop a more complete record relating to the issue of liability and proximate cause" so that a complete record can be developed. Wolfsbruck v. Dow Chemical Co., 101 N.J. 252, 501 A.2d 924 (1985). Irrespective of the trial judge's ruling after hearing all the evidence relevant to the admissibility of Dr. Balis' opinion,[5] a complete record will have been created for purposes of appropriate appellate review of the question of admissibility. See also Salomon v. Eli Lilly & Co., 98 N.J. 58, 61, 484 A.2d 320 (1984); Shackil v. Lederle Laboratories, 219 N.J. Super. 601, 635, 530 A.2d 1287 (App.Div. *63 1987) (Stern, J.A.D. concurring), rev'd o.g., 116 N.J. 155, 561 A.2d 511 (1989).
I therefore concur in the judgment and would remand for trial.
HAVEY, J.A.D., dissenting.
The lead opinion concludes that the absence of any scientific support for Dr. Balis' "novel" causation theory is no impediment to its admission into evidence. Essentially, the lead opinion allows a jury to make a quantum leap that epidemiologists and other related disciplines, after years of exhaustive study, are not yet prepared to make. I would affirm the order precluding Dr. Balis' testimony and consequent summary judgment orders in Monsanto's favor. However, I would do so not by deciding whether Dr. Balis' theory has received "general acceptance" within the scientific community, see Windmere, Inc. v. International Ins. Co., 105 N.J. 373, 378, 522 A.2d 405 (1987), or acceptance even by a "substantial minority," as stated by Judge Hamlin. Rather, I would exclude the expert testimony, first because not a single study offered in evidence has concluded that PCBs probably cause colon cancer in human beings. Second, I would exclude it because the opinion has no factual basis.[1]
At the in limine hearing, Monsanto argued that Dr. Balis' theory that PCBs cause colon cancer in humans must be rejected because the theory had not received "general acceptance" within the scientific community. Monsanto's argument was *64 predicated on the pronouncement in Windmere that the admissibility of expert scientific evidence requires that the proponent prove the reliability of the evidence in terms of its "general acceptance within the professional community." 105 N.J. at 379, 522 A.2d 405. See also State v. Kelly, 97 N.J. 178, 209-210, 478 A.2d 364 (1984); State v. Cavallo, 88 N.J. 508, 516-517, 443 A.2d 1020 (1982); State v. Hurd, 86 N.J. 525, 536, 432 A.2d 86 (1981). This "general acceptance" standard flows from the essential requirement that a scientific technique have "sufficient scientific basis to produce uniform and reasonably reliable results and contribute materially to the ascertainment of truth[.]" Windmere, supra, 105 N.J. at 386, 522 A.2d 405, quoting State v. Cary, 49 N.J. 343, 352, 230 A.2d 384 (1967) [emphasis in original]. This requirement is a refinement of the standard originally proposed in Frye v. United States, 293 F. 1013 (D.C. Cir.1923), that a scientific principle or discovery is admissible when it has "gained general acceptance in the particular field in which it belongs"; that is, when it passes from the "experimental" stage and reaches a "demonstrable" stage. Id. at 1014.
Judge Hamlin interpreted "general acceptance" to mean acceptance by "at least a substantial minority of the applicable scientific community." Rubanick v. Witco Chemical Corp., 225 N.J. Super. 485, 500, 542 A.2d 975 (Law Div. 1988).
My problem with applying the Frye-Windmere "general acceptance" standard, or any quantified standard in a toxic tort case is that it involves the admissibility of the results of a scientifically novel device, technique or mode of analysis. See e.g., Windmere, supra, 105 N.J. at 377, 522 A.2d 405 (voiceprint analysis); Kelly, supra, 97 N.J. at 211-212, 478 A.2d 364 (scientific reliability of "battered-woman's syndrome"); Romano v. Kimmelman, 96 N.J. 66, 78, 474 A.2d 1 (1984) (breathalyzer test); Cavallo, supra, 88 N.J. at 525-526, 443 A.2d 1020 (diagnosis of tendency to commit rape on basis of rapist profile not generally accepted). The rationale of these decisions is that once a showing of "general acceptance" of the instrument or *65 technique has been made, courts may take judicial notice of its reliability and will admit into evidence test results without requiring further proof. See Windmere, supra, 105 N.J. at 378, 522 A.2d 405.
A simple mechanistic application of the "general acceptance" standard is not appropriate when the issue, as here, is whether a specific chemical has probably caused a particular disease. The issue is not whether there should be a judicial validation of a scientific device or mode of analysis "for all future use." Id. at 379, 522 A.2d 405. Rather, the question is whether there are sufficient factual and scientific underpinnings to the expert's causation theory.
Application of the "general acceptance" standard may spawn unjust results in a field such as toxic torts. Plaintiffs face complex and unique practical difficulties in their effort to prove causation because of long latency periods between exposure and illness, as well as the countervailing proofs that the plaintiffs have encountered other intervening exposures or forces which may have been the "cause" of their injury or disease. See Ayers v. Jackson Tp., 106 N.J. 557, 585, 525 A.2d 287 (1987). In my view, an epidemiological study of recent vintage may stand alone in establishing a causal relationship between a specific chemical and human cancer. Nevertheless, the study may be statistically sound because the population studied and controls and methodology employed render its results reasonably reliable. A qualified expert, who relies on this single study, as well as other pertinent facts and data, should not be prevented from rendering the causation opinion simply because a majority of those practicing in the applicable discipline have not yet confirmed the reliability of the study. A scientific "nose counting" to determine whether the expert's causation opinion has received "general acceptance" would, in such a circumstance, be unjust. U.S. v. Downing, 753 F.2d 1224, 1238-1243 (3rd Cir.1985).
*66 I therefore agree with the lead opinion that admission into evidence of a causation opinion should not be dependent upon "general acceptance" of the expert's underlying theory. However, while an expert's well-reasoned opinion, based on even a single epidemiological or other relevant study (together with other pertinent facts) may be admissible, there must be at least some conclusive support in the scientific community for the proffered theory in order to render the opinion reliable. It is one thing to say that the lag in majority acceptance of a theory should not deprive a litigant of his day in court; it is another to permit a jury to reach scientific conclusions that not a single scientist has yet been able to reach.
Rather than applying the "general acceptance" standard, determining admissibility of an opinion as to causation must be accomplished on a case-by-case basis because of the fact-specific nature of each case. However, the underlying concern is the same as that addressed in Frye, Windmere and Cavallo: the lynchpin to expert testimony is that it be reliable. See Cavallo, supra, 88 N.J. at 517-518, 443 A.2d 1020.
It is clear that the reliability requirement is not satisfied simply by the expert testifying as to his or her personal belief or opinion. The causal relationship between exposure to a chemical and human disease is not necessarily so simply because plaintiff's expert says it is so. See Viterbo v. Dow Chemical Co., 826 F.2d 420, 424 (5th Cir.1987). Also, the opinion cannot be based on "guess or conjecture." Pelose v. Green, 222 N.J. Super. 545, 549-551, 537 A.2d 745 (App.Div.), certif. den. 111 N.J. 610, 546 A.2d 530 (1988). While Evid.R. 56(2) permits an expert to base his opinion on facts or data made known to him before the hearing, and the underlying facts or data need not be admissible "[i]f of a type reasonably relied upon by experts in the particular field[,]" there are "limits to the permissible inferences that may be extracted from experts' testimony." Johnson v. Salem Corp., 97 N.J. 78, 91, 477 A.2d 1246 (1984).
*67 An expert's "bare conclusions," unsupported by factual evidence, is no more than an inadmissible "net opinion." Buckelew v. Grossbard, 87 N.J. 512, 524, 435 A.2d 1150 (1981). There must be a factual and scientific basis sufficient to meet the reliability threshold. Recently we stated the rule in Vuocolo v. Diamond Shamrock Chemicals Company, 240 N.J. Super. 289, 299, 573 A.2d 196 (App.Div. 1990) as follows:
Historically, courts have refused to admit expert medical testimony based on mere speculation or possibility, unsupported by the evidence. As one commentator has noted:
It seems universally agreed that an expert medical opinion as to the cause of death, disease, or other physical condition is inadmissible if it is solely an unsupported conclusion of the witness, since however well qualified the witness is, and however scientific or abstruse the subject matter is, an opinion must have reference to the material facts of the case as reflected by the evidence. [Annotation, "Opinion Evidence  Disease or Injury," 66 A.L.R.2d 1082, 1086 (1959)].
In requiring facts and data to support the opinion, the obvious concern is that such scientific theory, simply because it is termed "scientific" by the expert, will be accorded undue weight by untrained lay jurors, "who are overly deferential to anything portrayed as `science.'" Walker and Monahan, "Social Frameworks: A New Use of Social Science in Law," 73 Va.L.Rev. 559, 576 (1987).
As stated, a salient and recent study establishing causal connection between a chemical and human cancer may be supportive of a causation theory notwithstanding the fact that a majority of the relevant discipline has not yet expressed agreement with the study. Also, rather than focusing solely on a single discipline, such as epidemiology, other scientific methods and data may be helpful, such as toxicology, animal studies, clinical research, public sector studies and investigations conducted of the specific contaminated site in question. See Mauro v. Owens-Corning Fiberglas Co., 225 N.J. Super. 196, 206, 542 A.2d 16 (App.Div. 1988), aff'd sub. nom. Mauro v. Raymark Indus., 116 N.J. 126, 561 A.2d 257 (1989). Further, factors pertaining to the injured party in question, such as his or her treatment and medical history, significant diagnostic and *68 pathological findings, and the duration, quantum and manner of exposure to the offending chemical, may well be significant in resolving the threshold question of reliability.
The federal court decisions on this point are instructive. For example, the lead opinion cites Ferebee v. Chevron Chem. Co., 736 F.2d 1529 (D.C. Cir.1984), cert. den. 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984), for the proposition that an expert's opinion as to causation is admissible despite absence of "general acceptance" of the theory.
However, of significance is that in Ferebee, plaintiff's exposure to the toxic herbicide paraquat was extensive and the indicia of his illness was immediate. Id. at 1532. Moreover, the experts who gave the opinion that the paraquat caused plaintiff's pulmonary fibrosis were his treating physicians who diagnosed his sickness, treated and examined him and employed standard tests in reaching their conclusion as to causation. Id. at 1533. Of most significance is the court's observation that since 1960, paraquat exposure "has been known" to lead to lung cancer, and medical literature and defendant's own incident reports had cataloged cases in which paraquat had caused immediate death or lung problems. Id. at 1537. Thus, in contrast to the case before us, plaintiff's experts had some scientific support for their opinion.[2]
*69 The lead opinion does not cite Richardson v. Richardson-Merrell, Inc., 857 F.2d 823 (D.C. Cir.1988), cert. den. ___ U.S. ___, 110 S.Ct. 218, 107 L.Ed.2d 171 (1989), where the D.C. Circuit retreated from its approach in Ferebee and upheld a judgment n.o.v. setting aside a jury verdict in favor of plaintiffs who alleged that in utero ingestion of Bendectin caused plaintiff-infant's congenital limb defects. Id. at 824. Applying the Federal Rule of Evidence 703 (essentially identical to our Evid.R. 56(2)), the court reasoned that plaintiffs' expert's opinion as to causation lacked a scientific or factual basis. 857 F.2d at 829-833. The expert acknowledged that the question of causation between Bendectin and birth defects was "not fully answered" and that the present data only "indicate[d] a suspicion." Id. at 830. He also acknowledged that in vivo (animal) teratology studies served merely to raise a "suspicion" regarding the effects of spermicide exposure in humans. Ibid. Richardson noted that the drug Bendectin had been extensively studied and a "wealth of published epidemiological data has been amassed, none of which has concluded that the drug is teratogenic." Id. at 832 (emphasis added).
Recently, the court in Brock v. Merrell Dow Pharmaceuticals, 874 F.2d 307 (5th Cir.1989), reh'g den. en banc, 884 F.2d 167 (5th Cir.1989), reversed a plaintiff's verdict where plaintiff infant was born with Poland's Syndrome allegedly caused by Bendectin taken by the mother during pregnancy. The court, after a thorough analysis of the methodology employed by various epidemiological studies relied on by plaintiff, found "the lack of conclusive epidemiological proof to be fatal to the Brocks' case." Id. at 313. The court added:
While we do not hold that epidemiological proof is a necessary element in all toxic tort cases, it is certainly a very important element. This is especially true when the only other evidence is in the form of animal studies of questionable applicability to humans. We are not the first court to emphasize the importance of epidemiologic analysis. [Ibid; emphasis added].
*70 See also Novak v. U.S., 865 F.2d 718, 723 (6th Cir.1989) (expert's opinion as to causal relationship between fatal dermatomyositis and swine flu vaccine inadmissible in light of "totality of medical evidence" and "overwhelming" proof in the scientific community that any specific cause of dermatomyositis is "unknown and conjectural at best"); Sterling v. Velsicol Chemical Corp., 855 F.2d 1188, 1208-1209 (6th Cir.1988) (testimony of plaintiffs' experts, based on clinical ecological tests, rejected because no scientific studies exist linking carbon tetrachloride to damage to immune system, and expert did not examine or interview plaintiffs or perform requisite medical tests).
Finally, in In re Paoli R.R. Yard PCB Litigation, 706 F. Supp. 358 (E.D.Pa. 1988), the question was whether PCBs, produced by Monsanto and used by Amtrak in its transformers, had caused injury to the population living adjacent to Amtrak's rail yard. Defendants moved for summary judgment arguing that plaintiff's experts failed to refute a federal study (the ATSDR[3] study) which concluded that the residents' PCB level did not differ significantly from the PCB level borne by the general population, and further that the experts' opinions were contrary to generally accepted scientific and medical opinion regarding PCBs. Id. at 365-366. In granting summary judgment, the court "looked behind" the experts' statements that animal studies supported their conclusion that PCBs cause disease in humans. Id. at 368. It rejected the use of such studies as being unreliable, and found the Yusho and Yu Cheng studies, regarding disease in a Japanese population that had ingested PCB-contaminated rice, was of no value. Ibid. The court also concluded that plaintiff's experts' opinions had no scientific or medical support for their conclusion that PCB caused specific diseases, particularly in view of the ATSDR study. Id. at 370-372.
*71 The Paoli court also rejected the expert's use of a "meta-analysis" of many epidemiological studies of PCBs, none of which independently showed any connection between PCBs and cancer. Id. at 373. The expert claimed that when the data was read together, it presented "substantial evidence for a causal association between excess risk of death from cancer of the liver, biliary tract and gall bladder and exposure to PCBs." Id. at 373. The court found the "meta-analysis" as an unreliable, novel scientific technique which could potentially confuse the jury because of its scientific nature, and because none of the plaintiffs had cancer of the liver, biliary tract or gall bladder. Ibid.
It is evident that the federal cases conflict in their approach to the "reliability" issue. This conflict no doubt arises because of the fundamental difference between the more exacting standard of proof necessary before a theory is "accepted" in the scientific community, and the legal standard predicated on reasonable medical probability. See Ferebee supra, 736 F.2d at 1536. However, what clearly evolves from these cases is that if there is no support for the proffered theory found in the scientific community, and if the opinion is so lacking in underlying facts and probative force that no reasonable expert would render it, then it must be excluded.
A careful examination of all facts and data relied on by Dr. Balis in support of his causation theory satisfies me that his opinion was properly excluded. That occurrence of colon cancer in males under 30 is rare does not by itself prove that 29-year old Rubanick's exposure to PCBs probably caused his colon cancer. He simply may have fallen within the statistical minority for reasons entirely apart from PCB exposure. As Judge Hamlin observed, the "human body, with its residual genetic weaknesses and differences, requires an accounting of other factors and information." Rubanick, supra, 225 N.J. Super. at 494, 542 A.2d 975. The judge concluded that Dr. Balis had "glossed over" significant factors such as decedent's health, diet, family history and exposure to other causative *72 sources. Id. at 503, 542 A.2d 975. In addition, little was said by Dr. Balis as to the duration and quantum of exposure to the offending chemical, or whether the dosage in question was sufficient to cause any adverse health effect in humans. Indeed, as in Paoli, the witness completely disregarded the results of the federal (NIOSH)[4] study of the Witco site which disclosed that blood serum PCB levels of Witco employees were within normal range. Rubanick, supra, 225 N.J. Super. at 503, 542 A.2d 975. Further, unlike the physicians-experts in Ferebee, Dr. Balis did not, and indeed could not treat the decedent. Absent here is a sound methodology employed to reach a cause-effect relationship such as use and examination of "tissue samples, standard tests, and patient examination," the results of which may or may not have been supportive of a claim of causation. Ferebee, supra, 736 F.2d at 1535-1536.
The fact that three other Witco employees had died of other forms of cancer is also of little qualitative value. Absent from the record is any reference to the employees' employment history, their exposure to PCBs, their family history and potential exposure to other cancer-causing chemicals outside or even within the Witco plant. Without such a factual foundation, Dr. Balis' bare conclusion that the deaths are somehow significant in proving causation between the PCBs and decedents' colon cancer is unacceptable.
Moreover, while Dr. Balis' ultimate opinion is couched in "highly probable" and "probable" terms, his in limine testimony throughout, when pressed, is based on "possibilities" and "high possibilities." A medical or scientific opinion must be couched in terms of reasonable probability, not possibility. Vuocolo, supra, 240 N.J. Super. at 300, 573 A.2d 196; Johnesee v. Stop & Shop Cos., Inc., 174 N.J. Super. 426, 431, 416 A.2d 956 (App.Div. 1980).
*73 Of most importance is the total lack of support in the scientific studies and literature for Dr. Balis' theory. Bertazzi's study of PCBs' adverse effects on humans, cited by the majority and Dr. Balis, reports cases of cloracne, and cancer of the liver, GI tract and pancreas, but not of the colon. Bertazzi, et al, "Cancer Mortality of Capacitor Manufacturing Workers," 11 Amer.J.Indus.Med. 165, 169-171 (1987). Nowhere does Bertazzi suggest that scientists can extrapolate his findings into a conclusion that PCBs also cause colon cancer. Moreover, Bertazzi reports that while the number of tumors found was higher than expected, the number of cases "was small, and the excess was not statistically significant." Id. at 169. He concludes that the "limitations discussed did not permit a causal association to be either proved or dismissed." Id. at 174. Such a finding is far short of reasonable scientific or medical certainty.
Similarly, Brown's study of workers exposed to PCBs reported no colon cancer. Also, he reports that the "slight excesses for liver cancer and cirrhosis of the liver are consistent with previously reported findings on experimental animals exposed to PCBs, and suggest that there may be an association between these causes of death and occupational exposure to PCBs." Brown and Jones, "Mortality and Industrial Hygiene Study of Workers Exposed to Polychlorinated Biphenyls," 36 Arch. Environ. Health 120, 128 (1981) [emphasis added]. Specifically, Brown states that "[b]ecause a relatively small number of deaths were observed, conclusions drawn from the results of this study are tentative." Ibid. I find that the lack of conclusive epidemiological proof in these studies as being fatal to Dr. Balis' opinion. See Brock, supra, 874 F.2d at 313. As in Richardson, 857 F.2d at 830, the studies merely raise a suspicion of causal relationship between PCBs and certain forms of human cancer and provide no support for an opinion that PCBs probably cause colon cancer in humans. In my view, it is inappropriate to allow a jury to conclude from these studies that causation in a specific case exists when the studies themselves *74 conducted by experts in the field, are at best inconclusive.
Dr. Balis' reliance on the animal studies, is also unwarranted. Preliminarily, decisions dealing with whether the results of animal studies can be used to predict the carcinogenicity of chemicals in humans are split, and thus provide us with little guidance. See Lynch v. Merrell-National Laboratories, 830 F.2d 1190, 1194 (1st Cir.1987) (in vivo animal studies not capable of proving causation in human beings in the absence of confirmatory epidemiological data); In re Agent Orange, 611 F. Supp. 1223, 1241 (E.D.N.Y. 1985), aff'd 818 F.2d 187 (2d Cir.1987), cert. den. sub. nom. Lombardi v. Dow Chem. Co., 487 U.S. 1234, 108 S.Ct. 2898, 101 L.Ed.2d 932 (1988) (animal studies "not helpful" because they involved different biological species); but see Villari v. Terminix Intern., Inc., 692 F. Supp. 568, 571 (E.D.Pa. 1988) (substantial segment of scientific community relies on animal studies in assessing health risks in humans).
In any event, I am in accord with Judge Hamlin's observations regarding the animal studies cited by Dr. Balis:
In short the bulk of those studies deal with ingested PCBs in rodent populations with varying degrees of chlorination, higher than that involved here. In some cases where PCBs with 54% chlorination were administered (along with benzenehexachloride), liver cancers were observed. Lesser degrees of chlorination did not give rise to these results. In no cases did any test animals develop colon cancer. To make the quantum leap from laboratory animal non occurrence to human causality to a reasonable degree of medical certainty is not warranted or supportable. [Rubanick, supra, 225 N.J. Super. at 502, 542 A.2d 975].
I am also in accord with the judge's rejection of the Environmental Protection Agency's declaration that PCBs are "harmful." Id. at 497-498, 542 A.2d 975. As he properly observes, the regulation, 40 C.F.R. 761.20, refers to toxicity, not carcino-genicity. Moreover, the regulation and enabling statute, 15 U.S.C.A. 2601 (1982), are intended to regulate chemical substances; they do not pretend to establish a basis of proving *75 within scientific certainty that a particular chemical caused illness in a specific person.
The lead opinion suggests that Dr. Balis should be permitted to testify and that all factors which may support his opinion "should be explored at a trial to the extent that they are relevant." At 55, 576 A.2d at 13. Presumably, this would allow the scope of Dr. Balis' opinion to be expanded beyond his written report, deposition and in limine testimony, based on facts which may be adduced at trial, even though such an expansion would no doubt cause undue surprise and prejudice to Monsanto. See R. 4:10-2(d) and R. 4:17-7. In any event, plaintiffs have not suggested to us that other facts will be adduced at trial that may lend support to Dr. Balis' theory. Indeed, once Dr. Balis' testimony was precluded, plaintiffs did not oppose Monsanto's motion for summary judgment.
The majority also concludes that the absence of a factual basis or scientific support for Dr. Balis' causation theory goes to the weight to be accorded his opinion, not to its admissibility. At 50-51, 576 A.2d at 11. However, the purpose of Evid.R. 56(2) is to provide "some assurance of reliability before scientific evidence is admitted." Cavallo, supra, 88 N.J. at 518, 443 A.2d 1020. As stated, this is so because of the substantial danger that the jury will accord "excessive weight to unreliable expert testimony ... because the evidence is labeled `scientific' and `expert.'" Ibid. It is therefore the trial court's function, and not the jury's, to make the threshold reliability determination. The judge here made that finding after a thorough in limine hearing and painstaking analysis of the record.
For the foregoing reasons, Judge Hamlin properly granted Monsanto's application to bar the testimony of Dr. Balis.
NOTES
[1] Witco, the employer of the decedents, was named a nominal defendant for discovery purposes only.
[2] Balis had testified that a substantial number of the scientists who had considered the interaction on PCBs in humans and published on the subject had concluded that PCBs caused cancer in humans.
[3] Dr. Fahey testified and expressed opinions about Dr. Balis and his proposed testimony without having been furnished all of the deposition testimony of Dr. Balis. In challenging the scientific approach of Dr. Balis he stated: "... there is no evidence that I have seen to this date that would demonstratively suggest that the individual [Rubanick] actually did have extensive exposures to PCBs...." Apparently, he was not given the information made available to and referred to by Dr. Balis.
[4] According to Dr. Balis' testimony, Dr. Cole "was on the I.A.R.C. committee that listed PCBs as carcinogens...." Dr. Cole testified that he spent a one year sabbatical at the I.A.R.C. during the years he was a professor at Harvard School of Public Health as well as serving as a consultant to that organization for many years. Dr. Cole asserted that he did not concur in the I.A.R.C.'s determination to list PCBs as a potential carcinogen.
[5] A cancer family is one whose members are at an extremely high risk of developing cancer due to genetic predisposition to the disease.
[6] Carcinogen is defined as "[a]ny substance or agent which causes the development of a cancer," Schmidt's, Attorneys' Dictionary of Medicine and Wordfinder (1982); and "a substance or agent producing or inciting cancer." Webster's Ninth New Collegiate Dictionary (1988).
[7] Balis also testified along these lines and cited various publications, including one of his own. Balis, "Antagonists and Nucleic Acids, Frontiers of Biology," 248-249 (1968); Setic & Lipchin, "Inhibition of Tumor Introduction and Development." He also referred to an I.A.R.C. report on the subject.
[8] It may be argued that by virtue of his specialization and research background in cancer he was more qualified than a medical doctor who is involved with the care and treatment after the fact of cancer development in patients, and including certain of the experts produced by Monsanto.
[9] Although the language of Evid.R. 56(2) no longer specifically refers to the expert testifying within the parameters of such skill, knowledge, or training, the comment to that rule suggests that the requirements that an expert be qualified under Evid.R. 19 and that the witness' testimony assist the trier of fact to understand the evidence or determine a fact in issue were intended to replace the previous language of the rule. In addition, Evid.R. 7 favors the admissibility of evidence.
[14] Under Fed.R.Evid. 702, 703 and 705, the expert may testify only in terms of opinion subject to cross-examination and may base an opinion upon matters not of record  provisions which seem to indicate an overall intent that the questioning of the basis for an opinion should usually go the weight and not the admissibility of the opinion.
[10] Multiple factors may also give rise to "Synergy" which is defined as: "Action of two or more agents or organs working with each other; cooperation. Combined action; coordinated action." Taber's Cyclopedic Medical Dictionary, S-146 (12th ed. 1973).
[11] Monsanto's attorney did object, at the close of the proceedings, to consideration of these two documents.
[1] The three day in limine hearing was a "battle of experts" as to credibility of the proffered opinion. Dr. Thomas Fahey, who is "deputy chief physician" and "responsible" for "patient care activities" at Sloan-Kettering and Associate Dean of the Cornell University Medical College, testified for the defense. There was lengthy analysis of the nature of cancer research at Sloan-Kettering and with respect to colon cancer generally. Dr. Fahey concluded that "there is no evidence at this time that [PCBs] are directly related to the production of cancers." Two other experts also testified for defendant. Dr. Balis himself recognized the limited amount of relevant research by himself and others. Judge Petrella notes the equivalent of an Evid.R. 4 analysis advocated by Professor Weinstein. At 54-55, 576 A.2d at 13-14. I share the need for an Evid.R. 4 analysis and believe that Cavallo suggested its applicability. 88 N.J. at 519, 443 A.2d 1020.
[2] The death rate from cancer at age 25 is 0.5 out of 100,000 and is 18 out of 100,000 at age 52-53. Further relevant details and comparisons with Witco employees who contracted cancer can be developed.
[3] The sampling appears in dispute.
[4] Judge Havey states that "the question is whether there are sufficient factual and scientific underpinnings to the expert's causation theory", at 65, 576 A.2d at 19. This case cannot turn on the fact that Dr. Balis has not developed and reduced his theory to writing in a scientific journal. In my judgment facts may be developed so as to render his opinion reliable even if no other expert in the scientific community has to date conducted any study which supports the theory. For example, if an extraordinarily high percentage of Witco employees of decedents' ages, who worked contemporaneously with them, contracted cancer, as compared with the general population of cancer victims, there would be factual support which might itself substantially enhance the reliability of Dr. Balis' theory.
[5] Of course, defendants will challenge the credibility and opinion of Dr. Balis, if it is admitted, by pointing out all the evidence and factors lacking from his analysis, as developed by Judge Havey.
[1] Because I would rest my affirmance on the absence of scientific and factual bases for Dr. Balis' opinion, I do not reach the question whether Dr. Balis, as a biochemist, was qualified to testify as to causation in specific human beings. I note, however, that while our courts have taken a liberal approach in allowing cross-qualification of experts in other contexts, I hesitate to conclude that a biochemist, while highly qualified in the field of cancer research, may testify as to causation between a chemical and a disease in a specific individual without any experience in the medical treatment of human beings and the diagnosis of diseases.
[2] The lead opinion also cites Wells v. Ortho Pharmaceutical Corp., 788 F.2d 741 (11th Cir.1986), cert. den. 479 U.S. 950, 107 S.Ct. 437, 93 L.Ed.2d 386 (1986). Wells has been criticized at least in the medical profession, as permitting "legal cases [to be] decided on the type of evidence that the scientific community rejected decades ago[.]" 315 N. Eng. J. Med., 1234, 1235 (1986). In particular the following statement in Wells was found troublesome:

If the factfinder here is convinced that plaintiffs have proven to a reasonable degree of medical certainty, which is the legal standard employed in this case, that Ortho-Gynol caused Katie Wells' arm, shoulder and hand defects, it does not matter in terms of deciding the case that the medical community might require more research and evidence before conclusively resolving the question. What matters is that this particular factfinder found sufficient evidence of causation in a legal sense in this particular case, and that that finding is not clearly erroneous. [Wells, supra, 788 F.2d at 745].
[3] Agency for Toxic Substances and Disease Registry.
[4] The National Institute of Occupational Safety and Health.