220 N.J. Super. 110 (1987)
531 A.2d 744
MICHELENE PEARSON, GENERAL ADMINISTRATRIX AND ADMINISTRATRIX AD PROSEQUENDUM OF THE ESTATE OF JUDITH PEARSON, DECEASED; AND MICHELENE PEARSON, INDIVIDUALLY, PLAINTIFFS-APPELLANTS,
v.
H. ST. PAUL; RUTH CHIN-HICKS; UNITED HOSPITALS ORTHOPEDIC CENTER, DEFENDANTS-RESPONDENTS, AND (FICTITIOUSLY NAMED) JOHN DOE, M.D., ET ALS.; RICHARD ROW, M.D., ET ALS., DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Submitted March 31, 1987.
Decided April 21, 1987.
*111 Before Judges PRESSLER, BAIME and ASHBEY.
Francis X. Dorrity, for appellant.
*112 Conway, Reiseman, Mattia & Sharp, for respondents (James B. Sharp, of counsel; Peter C. Gordon, on the brief).
The opinion of the court was delivered by PRESSLER, P.J.A.D.
Plaintiff Michelene Pearson, individually and as general administratrix and administratrix ad prosequendum of the estate of Judith Pearson, appeals from an order of involuntary dismissal entered at the close of her liability proofs. We reverse.
This is a medical malpractice case. Plaintiff's decedent, an otherwise healthy 16-year-old girl, was admitted to United Hospitals Orthopedic Center in June 1982 for arthroscopic surgery of the left knee, a procedure which, according to this record, is relatively simple and not life threatening. The procedure was performed under general anesthesia administered by defendant Irene Alexis St. Paul, a trained, certified nurse anesthetist. No anesthesiologist was present. At the conclusion of the procedure, the child was moved by stretcher from the operating room to the nearby recovery room, accompanied by St. Paul and two residents. All three left almost immediately thereafter, and the child was left in the care of the recovery room nurse, defendant Ruth Chin-Hicks. There was one other patient then in the six-bed recovery room to whom Chin-Hicks was then attending. The child went into cardiac arrest within 10 or 15 minutes after her arrival in the recovery room. She sustained severe brain damage before she could be resuscitated, remained in a coma for five days, and then died.
According to the testimony of St. Paul, the child was beginning to overcome the effects of anesthesia while still in the operating room. She was moving her arms and had responded to St. Paul's command to place her arms at her sides. According to the testimony of Chin-Hicks, the child was still asleep on her arrival in the recovery room but her breathing was normally deep and her color and vital signs were within normal range. Some 10 or 15 minutes later she, Chin-Hicks, was alerted to a *113 problem by the child's shallow respiration, and it was her opinion that the breathing had been shallow "a few minutes" before she noticed it. The child did not respond to Chin-Hicks' efforts to rouse her, and Chin-Hicks, believing the child to be having an "anesthesia problem," called for help from that department. St. Paul arrived, assessed the situation, and started to give the child oxygen. She also directed Chin-Hicks to administer narcon, a drug which reverses the effects of the narcotic component of the anesthesia which St. Paul had administered. When that had no effect, she directed Chin-Hicks to administer prostigmine and atropine, which reverse the effect of curare, the muscle-paralyzing component of the anesthesia and which had also been administered before the child was removed from the operating room. At that point, the child had still not revived, and an anesthesiologist was summoned. The efforts made by the medical staff from that point on were not, however, availing.
The trial judge granted the involuntary dismissal motion because he concluded that plaintiff's cause of action was inadequately supported by expert testimony. He characterized the testimony of plaintiff's medical expert as offering only a net opinion, and he excluded from evidence the report of an anesthesiologist consulted by the medical examiner in attempting to determine the cause of death. We are persuaded that he erred in both respects.
Plaintiff's medical expert, offered to establish the negligence of both St. Paul and Chin-Hicks, was Dr. David Callum Carmichael Stark, an anesthesiologist on the staff of Mount Sinai Hospital in New York City between 1965 and 1983 and chairman of its department of anesthesiology during the last four years of his tenure there. In 1983 he accepted an appointment as chief of anesthesiology at a teaching hospital in Syracuse as well as an appointment as clinical professor at the Upstate Medical Center. His qualifications and credentials were impeccable.
*114 Dr. Stark first explained the nature and effect of the anesthetic drugs used during the child's surgery, as well as the effect and purpose of their respective reversing drugs. In response to the question as to whether he had "an opinion with reasonable medical probability as to what caused this tragic event," he answered as follows:
It was my opinion that she met her death because of the negligent administration of the type of anesthesia that she received; by the failure on the part of the recovery room staff adequately to monitor her condition; to recognize the serious depression of the respiration and adequately to initiate proper resuscitative measures.
Relating the asserted negligence to applicable standards of care, he further opined as follows:
Based upon reasonable medical certainty, the dosage of narcotics that were administered to Judith Pearson were large beyond normal standards. Given that  even having given them, the precautions taken to avoid serious respirative depression in the recovery room were not taken, that is to say, either the administration of the antidote in the operative room or maintenance of the endotracheal tube until it was very clear that the patient's respiration was adequate; and certainly not to have instructed the recovery room that large doses of narcotics had been used and that such patient would be likely liable to run into respiratory problems shortly after admission to the recovery room.
Dr. Stark also found St. Paul negligent in not assuring the patient's breathing capacity when she left the recovery room by inserting an airway. According to the proofs, St. Paul had inserted an endotracheal tube during surgery but had removed it prior to transporting the patient to the recovery room. As Dr. Stark explained,
The oral airway is a tube, usually a tube made of plastic or metal which is placed between the teeth and over the tongue. This helps to prevent the tongue from falling backward into the back of the throat.
Dr. Stark had already explained that when a patient is anesthetized by curare and not breathing on her own, there is a risk that
With the residual effect of curare, the jaw may sag downwards and the tongue may fall backwards. Normally you keep the air passages open in the patient by the muscle power in controlling the jaw. If the jaw is paralyzed, the muscle controlling the jaws are paralyzed are weak, they do not necessarily need to be totally paralyzed, then the jaw falls backwards and the tongue may fall backward obstructing the airway.
*115 It is thus evident that in respect of St. Paul, the negligence perceived by Dr. Stark was, apart from the question of choice and dosage of anesthetic drug, her failure to have administered a narcotic-reversing drug in the operating room, her failure to have provided the child with an oral airway when she left the operating room, and the failure to impress upon Chin-Hicks the respiratory danger which the child was in because of the administration of narcotics.
With respect to the events which occurred in the recovery room, it was Dr. Stark's opinion, as a matter of reasonable medical probability and applying appropriate professional standards, that Chin-Hicks had failed adequately to monitor the patient. Having described the monitoring duties of the recovery room nurse in respect of vital signs, assuring proper breathing and an adequate oxygen supply and having expressed the opinion that proper monitoring would likely have detected the patient's distress before the cardiac arrest was irreversible, Dr. Stark concluded that Chin-Hicks could not "have paid sufficient attention to the quality of the patient's respiration at the critical period shortly after admission." On cross-examination Dr. Stark confirmed his deposition testimony that the dosages and their timing actually administered by St. Paul were within acceptable medical standards, making clear his view, nonetheless, that "the sequence of events was responsible for the respiratory problem in the recovery room."
The first question before us is whether Dr. Stark's testimony, above summarized and taking into account his cross-examination as well, was sufficient to establish a prima facie case of negligence against either defendant. The trial judge concluded that it was not. With respect to defendant St. Paul, he concluded that Dr. Stark's testimony was merely a net opinion because it was based on the bare assertion that the dosage of narcotics was beyond normal limits. From this proposition the trial judge further reasoned that Dr. Stark's opinion that a narcotic antidote should have been given in the operating room was also without factual foundation. The trial judge also concluded that *116 Dr. Stark's opinion respecting defendant Chin-Hicks' negligence was an unsupported net opinion.
We are persuaded that the trial judge erred as to both defendants. In respect of St. Paul, he made no reference to the main thrust of Dr. Stark's testimony, namely, that the applicable standard of medical care required insertion of an oral airway to safely see the patient through the respiratory danger period. Moreover, it is our view that the trial judge misconstrued the testimony regarding the narcotic reversal drug. The antidote was not necessary because too large a dose of narcotics was administered but rather to ensure that effects of the dose which was given, a quantity consistent with the surgical need, was effectively countered. We note that a net opinion has been defined as the bare conclusions of an expert unsupported by factual evidence. See Buckelew v. Grossbard, 87 N.J. 512, 524 (1981). In our view, it is patent that Dr. Stark's opinion in respect of St. Paul, whether or not it would have ultimately been accepted by the jury, was not a "net opinion" but was rather a conclusion adequately based on facts and expert assumptions permissibly and reasonably drawn therefrom.
With respect to defendant Chin-Hicks, it is our reading of this record that Dr. Stark's testimony supported the application of the res ipsa loquitur rule. As we have pointed out, Dr. Stark, after explaining proper recovery room procedure and particularly patient monitoring, concluded that under the circumstances this defendant could not "have paid sufficient attention to the quality of the patient's respiration at a critical time." As Justice Clifford explained in Buckelew, supra, 87 N.J. at 527:
Expert testimony to the effect that those in a specialized field of knowledge or experience consider a certain occurrence as indicative of the probable existence of negligence is at least as probative of the existence of such a probability as the "common knowledge" of lay persons.
We read Dr. Stark's testimony as expressing his opinion that in the view of the medical community the event which occurred *117 here does not ordinarily occur in the absence of negligence of the medical personnel in charge of the recovery room.
Not only are we satisfied that Dr. Stark's testimony was adequate to establish a prima facie case of negligence as against both defendants but we further conclude that any possible defect in the prima facie case would have been cured by a document in the medical examiner's file, namely, an expert report of Dr. Gerald Shapiro, which in our view the trial judge erroneously excluded from evidence. The facts surrounding that report are these. Following the child's death, the case was referred for autopsy and determination of the cause of death to Dr. Milton M. Melczer, an assistant medical examiner. Because he was not satisfied as to the cause of death from the morphological evidence, he conducted, as he testified, a further investigation during which he spoke to various of the medical personnel both directly and indirectly involved with the patient's care at the hospital. This investigation was inconclusive, and he, therefore, consulted with Dr. Goode, his supervisor and chief medical examiner, and with Dr. Goode's approval decided to obtain the services of an anesthesiologist "for the purposes of reviewing the chart to give an opinion." The consultant chosen was Dr. Gerald Shapiro, a board certified anesthesiologist to whom Dr. Melczer made available all of the records and other information which he had. Dr. Shapiro then furnished Dr. Melczer with a report stating both his findings and his opinion based thereon. Of particular interest was his opinion as to the irreversible coma, as he stated
This is usually not seen in a patient who is resuscitated immediately after the arrest, unless there are other extenuating circumstances, such as patients in congestive heart failure or with chronically obstructive pulmonary disease or other cardiopulmonary diseases that precipitated the cardiac arrest or would prevent successful oxygenation of the patient.
It appears that in the 10 or 15 minutes that the patient was in the recovery room the watchful eye wasn't focused on the patient as much as it should have been, and therefore, allowed the arrest to have been longer than it appears on paper to have caused this kind of damage in a well 16 year old female.
With respect to the pre-recovery room events, Dr. Shapiro further noted and opined that

*118 The patient received 2 cc's of innovar with 6 cc's of sublimaze which means that the patient received a considerable amount of a respiratory depressant which was not neutralized  plus 6 mg of curare, a muscle relaxant, which was not neutralized, by my standards, sufficiently  with 1 mg of prostigmine.
In any event, there is no indication on the chart of how the patient was allowed to develop hypoxia, hypercarbia, acidosis, respiratory insufficiency, respiratory arrest, and cardiac arrest.
We read this report as clearly implicating both the nurse anesthetist and the recovery room nurse in negligent conduct.
Dr. Shapiro's report was part of the medical examiner's file, and Dr. Melczer testified that he relied on it in reaching his final conclusion, namely, that the patient had died "because of post-operative respiration  post-operative respiratory failure, while under the influence of anesthetic agents, complicated by terminal acute bronchial pneumonia." Based on the foregoing, plaintiff's attorney offered Dr. Shapiro's report in evidence as part of the medical examiner's report pursuant to N.J.S.A. 52:17B-92, which provides in part that
The records of the office of the State Medical Examiner, and of the county medical examiners, made by themselves or by anyone under their direction or supervision, or transcripts thereof certified by such medical examiner, shall be received as competent evidence in any court in this State of the matters and facts therein contained.
Although no objection was made to the authentication of Dr. Shapiro's report,[1] the trial judge nevertheless refused its admission into evidence, concluding that the statute "does not give it a clean road into evidence." He was of the further view that while Dr. Melczer's testimony respecting the report might be admissible, there was no basis for admitting the document itself into evidence. We disagree. Dr. Shapiro's report was not prepared for litigation. It was solicited by the medical examiner's office and relied upon by that office in certifying to the cause of death. Dr. Shaprio's opinions respecting the cause of death were medical, rather than non-medical, opinions based on *119 medical facts. We are satisfied that it was therefore as much a part of the admissible record under the statute as any other part of the medical examiner's file. See State v. Reddick, 53 N.J. 66 (1968). And compare State v. Matulewicz, 101 N.J. 27 (1985); State v. Martorelli, 136 N.J. Super. 449 (App.Div. 1975), certif. den. 69 N.J. 445 (1976). The circumstances here are clearly distinguishable from those in Biro v. Prudential Ins. Co. of America, 57 N.J. 204 (1970), rev'g of dissent 110 N.J. Super. 391, 402 (App.Div. 1970), in which it was held that the scope of admissibility of medical examiner records includes medical facts and opinions respecting the cause of death but not opinions as to whether the death resulted from accident or suicide where both theses were consistent with the medical evidence.
Reversed and remanded for a new trial.
NOTES
[1] Although the report was not certified, as required by the statute, it was adequately authenticated by Dr. Melczer's testimony, and in any event, defendants did not object on authentication grounds.