**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3254-22

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

FRANCIS TATTOLI,

    Defendant-Appellant.

---

Submitted May 29, 2025 – Decided July 24, 2025

Before Judges Currier, Marczyk, and Paganelli.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Indictment No. 17-09-1215.

Jennifer Nicole Sellitti, Public Defender, attorney for appellant (Stefan Van Jura, Assistant Deputy Public Defender, of counsel and on the brief).

Mark Musella, Bergen County Prosecutor, attorney for respondent (Jaimee M. Chasmer, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant appeals from his convictions and sentence after a jury trial. He contends the prosecutor exceeded the permissible bounds of argument during summation and the court erred in admitting the medical examiner's report into evidence. In addition, defendant raises issues regarding the sentencing court's findings on certain aggravating and mitigating factors. After careful review, we discern no error and affirm.

## I.

Defendant was charged in an indictment with first-degree knowing or purposeful murder, N.J.S.A. 2C:11-3(a)(1) and (2) (count one); first-degree kidnapping, N.J.S.A. 2C:13-1(b) (count two); first-degree felony murder, N.J.S.A. 2C:11-3(a)(3) (count three); and third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d) (count four).

We derive the facts from the 2022 trial record. Defendant lived on the first floor of an apartment building. Monet Thomas lived upstairs with her boyfriend, Jonathan Ferreira, and their bulldog. The building's owner, Steve Sporanza, occasionally lived with Jonathan and Monet.

On December 17, 2016, Monet and Jonathan were getting ready to attend a Christmas party. While Jonathan took a shower and got dressed, Monet left the apartment to walk the dog.

2

A surveillance camera located in the corner of the first floor of the building captured defendant's apartment door, the hallway that led from the front door to defendant's door, a neighbor's front door, a staircase that led upstairs, and a staircase that led downstairs to a side door used to exit the building. The video footage was played for the jury numerous times during trial and upon request during their deliberations.

We provide a description of the events seen on the surveillance video footage for the reader's context. At approximately 8:54 p.m., defendant, wearing only a pair of gray sweatpants, opened his apartment door, exited his apartment, and went up the stairs. Approximately thirty seconds later, defendant came back downstairs and went into his apartment. He shut the door, but then opened the door, emerged from his apartment, looked around briefly, and then returned inside and shut the door again.

At 8:57 p.m., defendant again opened the door, emerged briefly, looked around, and then returned inside and shut his apartment door. At about 9:03 p.m., defendant opened his door and then immediately shut it. At around 9:04 p.m., defendant emerged from his apartment, looked around briefly, then returned to his apartment and shut his door.

3

A-3254-22

At about 9:07 p.m., defendant exited his apartment again, walked down the steps to the side door and opened it, looked outside, then shut the door and turned around. He walked up the stairs past his apartment to the first-floor neighbor's door where he knocked on the door several times and turned the knob. After no one answered the door, defendant returned to his apartment, leaving his door ajar.

At approximately 9:08 p.m., Monet's dog came down the stairs, with Monet following a few seconds behind. As the dog came down the stairs, defendant shut his door, but did not close it all the way. As Monet passed the apartment, defendant fully shut the door. Monet took the dog outside and shut the side door behind her. Thereafter, defendant opened his door and peeked toward the side door then went back inside and shut his door.

At around 9:12 p.m., defendant, now holding papers, opened his door and walked out of his apartment, leaving his door open before walking to the side door where he waited. When Monet returned, defendant spoke to her as she walked in. Defendant physically blocked Monet's path upstairs by walking up and stopping on the stairs that led to the second floor while Monet remained on the first floor and pulled out her phone. Defendant then reached over the

4

banister to grab Monet's phone, quickly came down the stairs, and continued to grab for the phone, positioning himself in front of Monet.

At approximately 9:13 p.m., defendant grabbed Monet's hands, then her arms and neck as he overpowered her and pushed her into his apartment, dropping the papers. Over the next six minutes, shadows of a struggle inside the apartment can be seen while the dog paced on the lower staircase. At 9:19 p.m., Monet's right foot and leg can be seen on the video. Monet appeared to be lying face up on the ground as her toes were pointed upward. Her foot repeatedly hit a chair blocking the doorway. The movement in her right foot stopped at approximately 9:20 p.m.

At approximately 9:22 p.m., defendant, walking around the chair blocking the doorway, stepped out of his apartment. He had blood on his bare upper body, bloody scratches on his back, and blood on his pants leg. Defendant then went back into his apartment. At approximately 9:24 p.m., defendant walked out of his apartment again, drinking a can of soda. He walked to the side door and stepped outside. The dog ran outside through the open door. Defendant walked back into his apartment at 9:24 p.m. leaving his apartment door open. Shortly after, at about 9:26 p.m., Jonathan came downstairs.

A-3254-22

At trial, Jonathan testified he had opened his apartment door and heard a strange clicking sound. He peered out his apartment's fire escape, looking for Monet and saw the dog standing alone by the building's side door. As he walked downstairs to look for Monet, Jonathan noticed defendant's apartment door was open, and he saw someone lying on the floor. He thought it was defendant. Jonathan went to the side door and let the dog in, then walked back inside and looked into defendant's apartment. He then realized it was Monet on the floor, called 9-1-1, and performed cardiopulmonary resuscitation because Monet was not breathing.

Jonathan testified that he still heard the clicking noise, which he determined was coming from the gas burners in defendant's apartment. He saw all the pilot lights on the stove were on. He turned them off then returned to Monet. Jonathan heard a noise in the apartment, and found defendant in the bedroom hiding under the covers in his bed and covered in blood.

Jonathan testified that he yelled at and kicked defendant while asking him what happened. Defendant just looked at him and said: "What did I do?" As Jonathan went back to Monet, defendant walked out of the apartment building. Jonathan ran outside to meet responding officers.

A-3254-22

Officer Matthew Bucceri testified that when he first arrived he saw Jonathan and defendant "tussling with each other . . . in front" [of the apartment building].  As he grabbed both men and walked with them to the apartment, he heard defendant mutter "I think I hurt her."  When they reached the apartment, Bucceri could see Monet lying on the floor motionless.  Defendant again said, "I think I hurt her."

Bucceri described the scene:

> I saw a female motionless, lying on her back on the kitchen floor.  There was a metal shelf that had apparently been toppled over, some cookware and other items that were just scattered about the floor, the signs of a struggle, that a fight had taken place.  It was a knife that was also on the floor located next to the victim and some small pools of blood.
>
> . . . .
>
> She had what appeared to be cuts on her hands.  Again, she's motionless.  I didn't see any rise or fall in her chest to indicate that she was breathing.  Unresponsive altogether.

Bucceri also testified that defendant "appeared to have some . . . cut[s] on his ribs and . . . scratches . . . on his back."

Monet and defendant were both taken to the hospital.  According to a testifying officer, defendant told an emergency department doctor that he

7

"choked" and "killed" Monet. Monet died nine days later after being declared brain dead.

A prosecutor's office detective collected evidence from defendant at the hospital. The detective observed that defendant had scratches and bruises on his neck, shoulder, and face, and was bloody "mainly on his right side and chest."

Another detective collected evidence from the crime scene pursuant to a search warrant, including a bloody, bent serrated knife with a black handle found on the floor, and Monet's clothing. The detective also secured the surveillance footage from the apartment building.

Bergen County Medical Examiner Frederick DiCarlo, M.D., conducted the autopsy of Monet's body and prepared a report. Prior to Dr. DiCarlo's testimony, the State indicated it intended to move Dr. DiCarlo's medical report into evidence at the close of the case under N.J.S.A. 26:6B-17(d). Defendant objected on hearsay grounds, asserting the report contained information that Dr. DiCarlo might not testify to. The trial court reserved its decision until after Dr. DiCarlo's testified.

Dr. DiCarlo then testified to the following: (1) Monet had abrasions on her legs; (2) there were cuts with "serration marks . . . consistent with a knife wound" on her hands which were likely "defense wounds" which occur when a

victim tries to protect themselves with their hands from an attacker with a knife; (3) Monet survived nine days in the hospital before being pronounced brain dead; and (4) Monet's death could be attributed to "hypoxic/anoxic encephalopathy and multi-organ system failure due to manual strangulation." Dr. DiCarlo described his findings of abrasions, "blunt impact injury," vascular congestion, and various internal hemorrhages as all being "pathologic findings that are seen in manual strangulation."

After cross-examination, re-direct, and re-cross examination, the trial court heard oral argument regarding the admission of Dr. DiCarlo's report into evidence. Defendant asserted the document could confuse the issues and invite the jurors to speculate, while the State contended that Dr. DiCarlo "testified at length to most of the details" and that "the report is fairly self-explanatory."

The trial court overruled the objection and admitted the report into evidence, finding Dr. DiCarlo was thoroughly questioned about it. The court stated: "Well, I read the statute. I read State v. Reddick, 53 N.J. 66 (1968)[,] and I think . . . [the State is] correct, the report goes to the jury. So[,] over the defense objection, that's in." (citation reformatted).

Pertinent to this appeal, defendant sought to advance a defense of intoxication throughout the trial, arguing his drug use that night negated any

purposeful or knowing actions, and he could only be responsible for reckless conduct. Through cross-examination, Jonathan testified he had known defendant and his family for years and that he had both observed first-hand and heard from defendant's brother that defendant had a drug problem, specifically, that defendant would smoke and become high on PCP,[1] also known as "Angel Dust."

Jonathan further testified that, over the six months leading up to Monet's death, he had seen defendant high on PCP about ten times, but he told police that defendant used PCP "like every day" because the building's owner had told him that. Jonathan said when defendant was high, "he was either scared and non-confrontational or very confrontational." He also described defendant as "[a] complete zombie" when he was high that was "so bad that you could go into his pocket and take out his money." Jonathan described defendant as "non-confrontational" when he found him in his apartment on December 17, 2016, and told police that he believed defendant was on drugs that day.

---

[1] PCP stands for phencyclidine, which can be used illicitly as a psychedelic drug. Merriam-Webster's Collegiate Dictionary 929 (11th ed. 2020) (defining "phencyclidine").

Defense counsel pursued the intoxication theory in cross-examining other witnesses and highlighting that defendant was dressed unusually for the winter weather, behaved oddly, and had a history of drug abuse. Additionally, defendant attempted to establish that he was injured during his altercation with Monet, he may not have caused Monet's knife injuries, and he had no motive to murder her.

In summation, defense counsel argued that defendant was under the influence of PCP on the night of these events, which prevented him from acting knowingly or purposely. Defendant argued that his behavior, lack of motive, and lack of any attempt to cover up the crime supported an intoxication defense and the State failed to prove his conduct was purposeful and with knowledge of the practical certainty that the intended result would occur.

In its closing argument, the State argued the evidence clearly showed defendant's actions were purposeful and that he murdered Monet with his bare hands. Pertinent to this appeal, the prosecutor made the following statement:

> Now, as it[ ha]s been already alluded to and as the [j]udge is going to instruct you, the State does not need to prove motive in this case. Now, I know we're all human beings and we would want to know why, but remember that in your deliberations that the State does not have to prove why this happened. And you don't need to agree as to why this happened. We can all have a different opinion as to why this happened.

> . . . I'm sure you can infer something based on his lack of clothes and his desire to get this incident off camera. But that is not something you all need to unanimously agree about, why this happened.

The jury convicted defendant of murder, kidnapping, and felony murder. He was acquitted of possession of a weapon for an unlawful purpose.

The sentencing court found aggravating factors one, the nature and circumstances of the offense; three, the risk that defendant will commit another offense; and nine, need to deter defendant and others; and mitigating factors seven, no prior indictable convictions; and fourteen, defendant was under the age of twenty-six. N.J.S.A. 2C:44-1(a) to (b).

On count one, the sentencing court imposed a fifty-five-year term of imprisonment, subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. On count two, the court sentenced defendant to a concurrent twenty-two-year term. The court merged count three with count one.

## II.

On appeal, defendant raises the following points for our consideration:

> POINT I
> DEFENDANT WAS DENIED HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL BY PROSECUTORIAL ERROR IN SUMMATION WHEN THE PROSECUTOR ARGUED TO THE JURY THAT THE KILLING WAS SEXUALLY MOTIVATED.

A-3254-22

POINT II
DEFENDANT WAS DENIED HIS RIGHT TO
CONFRONTATION AND TO A FAIR TRIAL BY
THE INTRODUCTION OF THE MEDICAL
EXAMINER'S REPORT OVER DEFENSE
OBJECTION.

POINT III
THE [FIFTY-FIVE]-YEAR NERA SENTENCE IS
MANIFESTLY EXCESSIVE AND UNDULY
PUNITIVE FOR THIS YOUNG ADULT OFFENDER
WHO ASSERTED A COMPELLING
INTOXICATION DEFENSE, EVEN IF IT WAS
ULTIMATELY REJECTED BY THE JURY.

A.

We begin with defendant's contentions regarding the admission of Dr. DiCarlo's report. Defendant asserts the admission of the report violated his rights to confrontation and a fair trial, and the resulting prejudice requires reversal of his convictions under Amendments Six and Fourteen of the United States Constitution and Article I, Paragraphs 1, 9, and 10 of the New Jersey Constitution.

We defer to a trial court's evidentiary ruling absent an abuse of discretion. State v. Garcia, 245 N.J. 412, 430 (2021). "We will not substitute our judgment unless the evidentiary ruling is 'so wide of the mark' that it constitutes 'a clear error in judgment.'" Ibid. (quoting State v. Medina, 242 N.J. 397, 412 (2020)). However, an evidentiary decision is reviewed de novo if the trial court applies

13

A-3254-22

the wrong legal standard in deciding to admit or exclude the evidence. State v.

Trinidad, 241 N.J. 425, 448 (2020).

In admitting the report into evidence, without further explanation, the

court stated it read the statute and Reddick. N.J.S.A. 26:6B-17(d) provides:

> The records maintained by the Office of the Chief State
> Medical Examiner and the office of each county or
> intercounty medical examiner, including those made by
> the applicable medical examiner or anyone under his
> direction or supervision, or transcripts thereof certified
> by the medical examiner, shall be received as
> competent evidence in any court in this State of the
> matters and facts therein contained.

Defendant essentially argues that although the report itself is admissible

under N.J.S.A. 26:6B-17(d), it contains inadmissible hearsay that violates the

Confrontation Clause.[2]

The Confrontation Clause provides a defendant with "the opportunity to

cross-examine and impeach the State's witnesses." State v. Williams, 184 N.J.

432, 443 (2005); see also State v. Budis, 125 N.J. 519, 530-31 (1991) ("Among

the primary interests protected by the right of confrontation are the opportunity

for defendants to face their accusers and to cross-examine the state's

---

[2] Defense counsel did not request any redaction to the report at trial; the objection was to the admission of the entirety of the report.

witnesses."). "The right to confront and cross-examine accusing witnesses is 'among the minimum essentials of a fair trial.'" Id. at 531 (quoting Chambers v. Mississippi, 410 U.S. 284, 294-95 (1973)). The Confrontation Clause prohibits a party from introducing testimonial hearsay "as a substitute for in-court testimony when a defendant has never been given the opportunity to cross-examine the witness." State v. Cabbell, 207 N.J. 311, 329 (2011).

A medical examiner's report is an admissible record under the statute as it is based on medical, rather than non-medical, opinions based on medical facts regarding the individual's cause of death. See Reddick, 53 N.J. at 68; Pearson v. St. Paul, 220 N.J. Super. 110 (App. Div. 1987).[3] However, opinions of non-testifying witnesses are not admissible as they constitute impermissible testimonial evidence barred under the Confrontation Clause.

In Reddick, the primary medical examiner issued a report of the autopsy but died prior to trial. The Court concluded the trial court properly redacted the portions of the report containing the deceased medical examiner's personal opinions on the cause of death and all conclusions regarding the place and manner of death. 53 N.J. at 68. The circumstances presented here are

_____

[3] These cases discuss a prior version of the statute. There are no substantial changes to the language than now contained in N.J.S.A. 26:6B-17(d).

distinguishable as Dr. DiCarlo conducted the autopsy, prepared the report, and testified at trial.

Defendant's reliance on State v. Bass, 224 N.J. 285, 316-18 (2016), is also unavailing. There, the trial court permitted the medical examiner to read findings contained in the report which were not his own and to then testify as to whether he agreed with them. Id. at 317-18. Our Supreme Court explained that because much of the witness's testimony consisted of reading portions of another medical examiner's findings who was deceased and therefore unavailable to testify, that the witness's testimony was "precisely the type of 'parroting' of the autopsy report that has been held to violate the Confrontation Clause." Id. at 318-19 (quoting State v. Michaels, 219 N.J. 1, 46 (2014)).

Unlike in Bass, Dr. DiCarlo was not acting as a "substitute medical examiner" but certified in the report that he not only personally performed the entire postmortem examination, including a complete autopsy, but also prepared the report himself, including his findings as to cause of death. Id. at 291. Dr. DiCarlo testified at trial and was extensively cross-examined about his testimony and the report. The admission of the report did not violate the Confrontation Clause.

16

B.

We turn to defendant's contentions regarding the State's closing argument. As stated above, when discussing the State's burden regarding motive, the prosecutor said:

> [T]he State does not need to prove motive in this case. Now, I know we're all human beings and we would want to know why, but remember that in your deliberations that the State does not have to prove why this happened. And you don't need to agree as to why this happened. We can all have a different opinion as to why this happened.
>
> You can—I'm sure . . . infer something based on his lack of clothes and his desire to get this incident off camera. But that is not something you all need to unanimously agree about, why this happened.
>
> [(Emphasis added).]

Defendant asserts there was no evidence presented at trial to support the theory that Monet was sexually assaulted, nor that defendant attempted to sexually assault her. Therefore, the State had no basis to suggest to the jury that defendant was motivated by a desire to commit a heinous sexual act. Further, defendant argues "the comment was extremely prejudicial because it unfairly undercuts defendant's sole defense that his inexplicable conduct was caused by PCP intoxication." Accordingly, defendant asserts the comment made the jury more likely to find defendant guilty of murder by adding a motive for his

17

conduct that was unsupported by any evidence and subverted defendant's right to present a complete defense or for the jury to fairly evaluate the merits of that defense.

As defendant did not object to the comment during the summation, we review for plain error. See Rule 2:10-2; State v. Singh, 245 N.J. 1, 13 (2021). "The mere possibility of an unjust result is not enough." State v. Funderburg, 225 N.J. 66, 79 (2016). "In the context of a jury trial, the possibility must be 'sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.'" State v. G.E.P., 243 N.J. 362, 389-90 (2020) (quoting State v. Jordan, 147 N.J. 409, 422 (1997)). Generally, if defense counsel does not object to a remark made in the State's summation, it suggests counsel did not believe the remarks were prejudicial when made. State v. Frost, 158 N.J. 76, 84 (1999).

"'[P]rosecutors in criminal cases are expected to make vigorous and forceful closing arguments to juries' and are therefore 'afforded considerable leeway in closing arguments as long as their comments are reasonably related to the scope of the evidence presented.'" State v. McNeil-Thomas, 238 N.J. 256, 275 (2019) (quoting Frost, 158 N.J. at 82).

Nonetheless, "even when a prosecutor's remarks stray over the line of permissible commentary . . . we reverse a conviction on the basis of prosecutorial misconduct only if 'the conduct was so egregious as to deprive defendant of a fair trial.'" Ibid. (quoting State v. Wakefield, 190 N.J. 397, 437 (2007)). "Only when the prosecutor's conduct in summation so 'substantially prejudice[s] the defendant's fundamental right to have the jury fairly evaluate the merits of his defense' must a court reverse a conviction and grant a new trial." Garcia, 245 N.J. at 436 (alteration in original) (quoting State v. Bucanis, 26 N.J. 45, 56 (1958)).

We are satisfied this brief statement in the State's summation was not "so egregious" to warrant a new trial. McNeil-Thomas, 238 N.J. at 275. First, during the defense summation, counsel discussed motive, stating:

> When I spoke to you in the beginning of the case it's the first thing I read. It's why? What's the motive? Why did it happen? What was going through [defendant's] mind at the time? Now, [the court] once again will tell you that the State has no obligation to prove motive . . . . But I want you to listen very carefully because [the court is] going to also tell you on the other hand you may consider the absence of motive in weighing whether or not . . . [d]efendant is guilty of the . . . crime . . . charged. . . .
>
> Is it sex, is it revenge, is it money? Who knows. Because there is none. There's no proof with regard to it. The simplest thing is to suggest, why? They're

neighbors. Why? [Defendant is] friendly with Jonathan. Now, . . . I ask you to consider that as a telling lack of evidence brought by the State . . . .

[(Emphasis added)].

Defense counsel raised sex as a possible motive and the State fleetingly responded to counsel's comments. Second, when considering the tenor and totality of the State's summation, the overriding theme is evident; the State urged the jury to infer purpose from their viewing of the surveillance video and if they chose, possible motive as well, while at the same time emphasizing that it did not need to prove motive.

Moreover, this fleeting remark was not capable of causing an unjust result. The entire series of events was captured on surveillance video. The footage showed defendant checking doors and looking for Monet before he distracted her with some papers, accosted her in the hallway, took away her phone, and dragged her into his apartment. The footage also depicted the assault taking several minutes and defendant's relaxed demeanor afterwards as he walked outside the apartment and building, drinking a soda. The jury had ample evidence from which it could determine the purposeful nature of the acts, whether defendant was intoxicated, and his guilt of the charges. When looking

20

at the prosecutor's remark in the context of the entire summation and the trial evidence, we deem it harmless.

C.

We next consider defendant's contentions regarding his sentence. He asserts the sentencing court improperly considered the aggravating and mitigating factors, and that the sentence is excessive.

Our review of a court's imposition of sentence is guided by an abuse of discretion standard. State v. Torres, 246 N.J. 246, 272 (2021). We defer to the sentencing court's factual findings and do not "second-guess" them. State v. Case, 220 N.J. 49, 65 (2014). We will "affirm the sentence of a trial court unless: (1) the sentencing guidelines were violated; (2) the findings of aggravating and mitigating factors were not 'based upon competent credible evidence in the record;' or (3) 'the application of the guidelines to the facts' of the case 'shock[s] the judicial conscience.'" State v. Bolvito, 217 N.J. 221, 228 (2014) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).

After a thorough analysis, the sentencing court found aggravating factors one, three, and nine, and mitigating factors seven and fourteen. The court stated it was "clearly convinced that the aggravating factors substantially outweigh the mitigating factors."

First, defendant contends the court erred in finding aggravating factor one, asserting there is nothing especially heinous, cruel, or depraved about the first-degree kidnapping and murder charges, and the court impermissibly double counted the factor.

In considering aggravating factor one, the sentencing court found that "defendant demonstrated extraordinary brutality," stating:

> [Monet] was in her own home, a place she consented to be and felt safe. She lived with her fianc[é], or person who soon would become her fianc[é]. They were preparing to go out that evening. [Monet] went to walk the dog, a routine thing that so many of us[,] if we own pets[,] . . . do every day. And we do so with the expectation that we will do so safely.
>
> I've already detailed what occurred, my view of what occurred that day on the video. She did not expect what confronted her that day, nobody could. . . . [D]efendant approached her, controlled her physical space, brought her into his apartment and terrorized her for a period of time. And that terror took the form of wrestling, struggling, and ultimately strangling her and taking her . . . life . . . .
>
> [The court] can't think of anything more frightening and more disturbing. If this case doesn't fit aggravating factor one, I don't know what does. It also appeared to me as if she was targeted. He walked up and down the hall. He looked out the back door. He was waiting for her to come in.
>
> The behavior is nothing less than horrific. The [c]ourt is confident that fighting for your life for a

22

> period of ten minutes against your attacker constitutes extreme cruelty and brutality. Ten minutes is a long time. Ten minutes is a long time to know that you are under attack. And ten minutes is a long time to fear for your life.
>
> Under these circumstances aggravating factor one is appropriate.

"Elements of a crime, including those that establish its grade, may not be used as aggravating factors for sentencing of that particular crime." State v. Lawless, 214 N.J. 594, 608 (2013). Using those elements to formulate the aggravating factors results in impermissible double-counting. State v. Kromphold, 162 N.J. 345, 353 (2000); see also State v. Fuentes, 217 N.J. 57, 74-75 (2014) (holding that sentencing courts "must scrupulously avoid 'double-counting' facts that establish the elements of the relevant offense").

"A court, however, does not engage in double-counting when it considers facts showing defendant did more than the minimum the State is required to prove to establish the elements of an offense." State v. A.T.C., 454 N.J. Super. 235, 254-55 (App. Div. 2018) (citing Fuentes, 217 N.J. at 75). Under aggravating factor one, the court "reviews the severity of the defendant's crime, the single most important factor in the sentencing process, assessing the degree to which defendant's conduct has threatened the safety of its direct victims and

the public." Fuentes, 217 N.J. at 74 (internal quotation marks omitted) (quoting Lawless, 214 N.J. at 609).

When finding aggravating factor one, the trial court relied on the video evidence, and the horrific treatment of the victim and her prolonged suffering during the commission of the crimes. The court noted defendant's demeanor and his preparation for the offenses, as well as the duration of the assault. As our Supreme Court has stated: "[A] sentencing court may justify the application of aggravating factor one, without double-counting, by reference to the extraordinary brutality involved in an offense." Fuentes, 217 N.J. at 75. "A sentencing court may consider 'aggravating facts showing that [a] defendant's behavior extended to the extreme reaches of the prohibited behavior.'" Ibid. (alteration in original) (quoting State v. Henry, 418 N.J. Super. 481, 493 (Law Div. 2010), abrogated in part on other grounds, State v. Palma, 219 N.J. 584, 595-96 (2014)). The video evidence suffices to support the sentencing judge's determination to find factor one.

Second, defendant asserts the court "should have assigned heavy weight to mitigating factor [fourteen]" because defendant was under twenty-six years old when he committed the offenses. In addition, defendant contends his cognitive age was much less than his age of twenty-four years because his drug

24

use may have altered his brain maturation and cognitive ability. Defendant did not produce any evidence of a diminished cognitive ability during the sentencing hearing.

In addressing mitigating factor fourteen, the court stated: "I do find mitigating factor [fourteen. Defendant] was [twenty-four] years old at the time of this offense. This mitigating factor indicates that if the defendant was under the age of [twenty-six], . . . I can take that into consideration."

Third, defendant contends the court should have found mitigating factor four, asserting his intoxication caused him to commit the offenses and that condition supports the finding of the factor.

Notably, defense counsel specifically argued at the sentencing hearing that mitigating factor four did not apply, stating:

> [Defendant] had a drug problem, a terrible drug problem, let me put a punctuation mark on that. That is not an excuse. It is not a justification. Frankly, Judge we didn't even argue mitigating factor number four with regard to that which allows that it. . . could constitute a defense under other circumstances. We haven't even articulated that.
>
> I think that would be both legally incorrect, but more importantly, . . . morally incorrect. Because that would endorse the use of drugs if you use drugs, it's okay to do something.

25

In light of counsel's statement, the court did not explicitly consider mitigating factor four. The court did, however, consider and discuss defendant's drug use when addressing other mitigating factors and found it weighed in favor of finding aggravating factor three. In addition, the jury rejected the intoxication defense. See also State v. Bieniek, 200 N.J. 601, 610 (2010) (finding "no fault in the court's disinclination to find . . . mitigating factor [four]" for the defendant's "severe hereditary alcoholism"). We discern no error in the court not considering mitigating factor four.

The trial court's findings on the aggravating and mitigating factors were based on competent, credible evidence contained in the record. We discern no reason to disturb the sentence.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-3254-22